United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued April 21, 1998 Decided June 23, 1998

 No. 97-5343

 United States of America, 

 Appellee

 v.

 Microsoft Corporation, 

 Appellant 

 Consolidated with

 98-5012

---------

 Appeals from the United States District Court 

 for the District of Columbia 

 (No. 94cv01564)

 Richard J. Urowsky argued the cause for appellant. With 
him on the brief were John L. Warden, Steven L. Holley, 
Richard C. Pepperman, II, Andrew C. Hruska, James R. 
Weiss, William H. Neukom and David A. Heiner, Jr.

 A. Douglas Melamed, Deputy Assistant Attorney General, 
U.S. Department of Justice, argued the cause for appellee. 
With him on the briefs were Joel I. Klein, Assistant Attorney 
General, Catherine G. O'Sullivan and Mark S. Popofsky, 
Attorneys.

 Daniel E. Lungren, Attorney General of California, James 
E. Ryan, Attorney General of Illinois, Carla J. Stovall, Attor-
ney General of Kansas, J. Joseph Curran, Jr., Attorney 
General of Maryland, Scott Harshbarger, Attorney General 
for the Commonwealth of Massachusetts, Jeremiah W. (Jay) 
Nixon, Attorney General of Missouri, Joseph P. Mazurek, 
Attorney General of Montana, Frankie Sue Del Papa, Attor-
ney General of Nevada, Tom Udall, Attorney General of New 
Mexico, and W.A. Drew Edmondson, Attorney General of 
Oklahoma, members of the Bar of this Court, were on the 
brief of certain States as amici curiae, with whom appeared 
the various other Attorneys General of the participating 
States.

 Before: Wald, Williams and Randolph, Circuit Judges.

 Opinion for the Court filed by Circuit Judge Williams.

 Opinion concurring in part and dissenting in part filed by 
Circuit Judge Wald.

 Williams, Circuit Judge: The district court entered a 
preliminary injunction prohibiting Microsoft Corporation 
from requiring computer manufacturers who license its oper-
ating system software to license its internet browser as well. 
In granting the preliminary injunction the court also referred 
the government's motion for a permanent injunction to a 
special master. Microsoft appeals the preliminary injunction 
and applies for a writ of mandamus revoking the reference to 
a master. We find that the district court erred procedurally 
in entering a preliminary injunction without notice to Micro-
soft and substantively in its implicit construction of the 
consent decree on which the preliminary injunction rested. 
We also grant the petition for mandamus and direct the 
district court to revoke or revise its reference.


 I.

 This case arises from Microsoft's practices in marketing its 
Windows 95 operating system. An operating system is, so to 
speak, the central nervous system of the computer, control-
ling the computer's interaction with peripherals such as key-
boards and printers. Windows 95 is an operating system that 
integrates a DOS shell with a graphical user interface, i.e., a 
technology by which the operator performs functions not by 
typing at the keyboard but by clicks of his mouse. Operating 
systems also serve as "platforms" for application software 
such as word processors. As the word "platform" suggests, 
the operating system provides a basic support structure for 
an application via "application programming interfaces" 
("APIs"), which provide general functions on which applica-
tions can rely. Each operating system's APIs are unique; 
hence applications tend to be written for particular operating 
systems. The primary market for operating systems consists 
of original equipment manufacturers ("OEMs"), which make 
computers, install operating systems and other software that 
they have licensed from vendors such as Microsoft, and sell 
the package to end users. These may be either individual 
consumers or businesses.

 In an earlier opinion, also arising from litigation generated 
by the Justice Department's 1994 antitrust suit against Mi-
crosoft, we briefly described Microsoft's role in the software 
industry and some of the industry's economics. United 
States v. Microsoft Corp., 56 F.3d 1448, 1451-52 (D.C. Cir. 
1995). Because IBM chose to install Microsoft's operating 
system on its personal computers, Microsoft acquired an 
"installed base" on millions of IBM and IBM-compatible PCs. 
That base constituted an exceptional advantage, and created 
exceptional risks of monopoly, because of two characteristics 
of the software industry--increasing returns to scale and 
network externalities. First, because most of the costs of 
software lie in the design, marginal production costs are 
negligible. Production of additional units appears likely to 
lower average costs indefinitely. (I.e., the average cost curve 
never turns upward.) Second, an increase in the number of 
users of a particular item of software increases the number of 

other people with whom any user can share work. As a 
result, Microsoft's large installed base increases the incentive 
for independent software vendors to write compatible applica-
tions and thereby increases the value of its operating system 
to consumers.

 The Department's 1994 complaint alleged a variety of anti-
competitive practices, chiefly in Microsoft's licensing agree-
ments with OEMs. Along with it, the Department filed a 
proposed consent decree limiting Microsoft's behavior, the 
product of negotiations between Microsoft, the Department 
and European competition authorities. Most relevant here is 
s IV(E) of the decree:

 Microsoft shall not enter into any License Agreement 
 in which the terms of that agreement are expressly or 
 impliedly conditioned upon:

 (i) the licensing of any other Covered Product, Oper-
 ating System Software product or other product (pro-
 vided, however, that this provision in and of itself shall 
 not be construed to prohibit Microsoft from developing 
 integrated products); or

 (ii) the OEM not licensing, purchasing, using or 
 distributing any non-Microsoft product.

 The Department sees a violation of s IV(E)(i) in Micro-
soft's marketing of Windows 95 and its web browser, Internet 
Explorer ("IE").

 The Internet is a global network that links smaller net-
works of computers. The World Wide Web ("the Web") is 
the fastest-growing part of the Internet, composed of mul-
timedia "pages" written in Hypertext Markup Language 
("HTML") and connected to other pages by hypertext links. 
Browsers enable users to navigate the Web and to access 
information.

 Most browsers are designed according to a "multi-
platform" approach, with different versions for each of a 
variety of different operating systems. Joint Appendix 
("J.A.") 81. Browsers also have the potential to serve as user 
interfaces and as platforms for applications (which could then 

be written for the APIs of a particular browser rather than of 
a particular operating system 1), providing some of the tradi-
tional functions of an operating system. Widespread use of 
multi-platform browsers as user interfaces has some potential 
to reduce any monopoly-increasing effects of network exter-
nalities in the operating system market. Browsers can en-
able the user to access applications stored on the Internet or 
local networks, or to operate applications that are indepen-
dent of the operating system. J.A. 103-05.

 Microsoft has developed successive versions of IE, the first 
of which was initially released with Windows 95 in July 1995. 
Microsoft's Windows 95 license agreements have required 
OEMs to accept and install the software package as sent to 
them by Microsoft, including IE, and have prohibited OEMs 
from removing any features or functionality, i.e., capacity to 
perform functions such as browsing. J.A. 86-89.

 The first three versions of IE were actually included on the 
Windows 95 "master" disk supplied to OEMs. Department 
Br. at 4; J.A. 1277-78. IE 4.0, by contrast, was initially 
distributed on a separate CD-ROM and OEMs were not 
required to install it. Microsoft intended to start requiring 
OEMs to preinstall IE 4.0 as part of Windows 95 in February 
1998. On learning of Microsoft's plans, the Department 
became concerned that this practice violated s IV(E)(i) by 
effectively conditioning the license for Windows 95 on the 
license for IE 4.0, creating (in its view) what antitrust law 
terms a "tie-in" between the operating system and the brow-
ser.2 (It is not clear why extension of Microsoft's established 

__________
 1 Similarly, Sun Microsystems's "Java" programming language 
allows programmers to write applications that will run on any 
computer, regardless of the operating system, as long as certain 
Java-related software (a Java "virtual machine" and Java "class 
libraries") is present. Internet browsers incorporate the necessary 
Java-related software, and hence allow Java programs to live up to 
their "write once, run anywhere" billing.

 2 The Department's language suggests that two products, and 
indeed, two license agreements are at issue. See, e.g., the Depart-
ment Br. at 4 ("Microsoft conditioned its OEM licenses to Windows 

IE policy to IE 4.0 aroused the Department's concern.) It 
filed a petition seeking to hold Microsoft in civil contempt for 
its practices with respect to IE 3.0, and requesting "further" 
that the court explicitly order Microsoft not to employ similar 
agreements with respect to any version of IE.

 A party seeking to hold another in contempt faces a heavy 
burden, needing to show by "clear and convincing evidence" 
that the alleged contemnor has violated a "clear and unambig-
uous" provision of the consent decree. Armstrong v. Execu-
tive Office of the President, 1 F.3d 1274, 1289 (D.C. Cir. 1993). 
Finding s IV(E)(i) ambiguous, the district court denied the 
Department's contempt petition. But that left open the 
possibility that Microsoft's practices might in fact violate the 
consent decree (though not so clearly as to justify contempt), 
and the district court continued the proceedings in order to 
answer that question, appointing a special master not only to 
oversee discovery but also to propose findings of fact and 
conclusions of law. For the meantime, the court entered a 
preliminary injunction forbidding Microsoft

 from the practice of licensing the use of any Microsoft 
 personal computer operating system software (including 
 Windows 95 or any successor version thereof) on the 
 condition, express or implied, that the licensee also li-
 cense and preinstall any Microsoft Internet browser soft-
 ware (including Internet Explorer 3.0, 4.0, or any succes-
 sor versions thereof).

J.A. 1300.

 A detour is necessary to explore what this injunction 
meant. In some of its papers before the court the Depart-
ment had argued for an order barring Microsoft from "forc-
ing OEMs to accept and preinstall the software code" that it 

__________
95 on OEMs' licensing Internet Explorer.") It is undisputed that 
OEMs enter into only one license agreement, which covers IE as 
part of Windows 95. J.A. 1274. Microsoft's central argument, of 
course, is that there is only one product. The terminology used in 
our introductory recitation of facts is of course not intended to 
resolve, or to reflect any resolution of, contested issues, and no 
inference as to those issues should be drawn from the wording of 
this section.

separately distributes at retail as IE 3.0. J.A. 996. Micro-
soft had responded that a Windows 95 operating system 
without IE software code simply would not function. The 
government characterized that assertion as "greatly over-
blown." J.A. 1237. The district court, in its justifying memo-
randum, referred to the injunction as barring Microsoft from 
"forcing OEMs to accept and preinstall the software code" 
separately distributed as IE 3.0, J.A. 1296-97; i.e., it em-
ployed the Department's exact words on the subject. After 
the injunction was issued, Microsoft and the Department had 
further consultations, at the end of which they entered a 
stipulation that Microsoft would be in compliance with the 
injunction if it extended to OEMs the options of (1) running 
the Add/Remove Programs utility with respect to IE 3.x and 
(2) removing the IE icon from the desktop and from the 
Programs list in the Start menu and marking the file 
IEXPLORE.EXE "hidden." J.A. 1780-81. It appears not to 
be disputed that these alternate modes of compliance do not 
remove the IE software code, which indeed continues to play 
a role in providing non-browser functionality for Windows. 
In fact, browser functionality itself persists, and can be 
summoned up either by entering four lines of code or by 
running any application (such as Quicken) that contains the 
code necessary to invoke the functionality. J.A. 1649-55. 
The agreed-upon means of compliance simply enable the 
OEMs to make user access to IE more difficult.3

 Microsoft appealed, as authorized by 28 U.S.C. 
s 1292(a)(1), and also sought mandamus directing the district 
court to revoke the reference to the special master.

 II.

 Microsoft claims at the outset that the district court, after 
finding no contempt, should simply have dismissed the De-
partment's petition. But although the petition was styled 
simply as one for an order to show cause "Why Respondent 

__________
 3 Additionally, by allowing OEMs to conceal IE, rather than to 
refuse it, the remedy fits poorly with the Department's tying 
theory. A tie-in is not affected by the purchaser's ability to discard 
the tied good.

Microsoft Corporation Should Not Be Held in Civil Con-
tempt," its prayer for relief sought not only pure contempt 
remedies (such as the attention-grabbing request for 
$1,000,000 a day in damages), but also an order directing 
Microsoft to cease and desist from requiring "OEMs to 
license any version of Internet Explorer as an express or 
implied condition of licensing Windows 95." J.A. 41. This 
was plainly a request for clarification of the consent decree, 
pinning down its application to the browser issue. Such a 
clarification may properly take the form of an injunction. 
See Brewster v. Dukakis, 675 F.2d 1, 3-4 (1st Cir. 1982). 
Indeed, as a consent decree contains an injunction already, a 
clarification naturally acquires the same character. (Of 
course, if the supplementary language goes beyond the con-
sent decree, it is a modification rather than a clarification, and 
is governed by different standards. See, e.g., United States 
v. Western Elec. Co., 894 F.2d 430, 435 (D.C. Cir. 1990) 
("Manufacturing Appeal").) Although the framing of this 
request as part of a remedy for contempt may have been odd, 
Microsoft does not contest that the proceeding put in contro-
versy the meaning of s IV(E)(i) as applied to its browser 
technology.

 This government request for clarification appeared in its 
petition shortly after its primary request--that the court 
adjudge Microsoft to be in contempt--and the word "further." 
Following "further" are a raft of requests for orders, this 
being just one. Microsoft says this clearly shows that the 
request was contingent on a finding of contempt. It further 
(here, in the sense of "additionally") presses on us some lines 
from a colloquy between the district court and a Department 
lawyer during the final hearing (December 5, 1997) before the 
court made its decision to issue a preliminary injunction:

 THE COURT: All right. Let me go to the relief that 
 you have requested here. Your petition is in terms 
 phrased only as a petition for a finding of contempt.

 MR. MALONE: That's correct, Your Honor.

 THE COURT: We've have [sic] gone beyond the show 
 cause [stage]. They have shown cause, and we're now at 
 the contempt stage.

 Is that the only relief that you're looking for, or am I 
 to read the petition as what I am inclined to read it as, 
 and that is a petition for specific enforcement?

 MR. MALONE: I think that is exactly how the Court 
 should read it, Your Honor. I think we have said, very 
 clearly, in arguing since the beginning that we want the 
 Court--we believe the Court can find Microsoft in con-
 tempt and can impose this specific relief to remedy the 
 contempt, and should quickly.

 Microsoft has opposed that on merits grounds, but I 
 don't think Microsoft has come along and said, "You can't 
 do that. This is just an order to show cause or some-
 thing else."

 The merits are very much before the Court, and what 
 we're asking is for the specific relief that we requested in 
 the petition.

 That really boils down to, Your Honor, simply an order 
 telling Microsoft, "You may no longer force OEMs to 
 take Internet Explorer as a condition of getting you[r] 
 Windows 95 license."

J.A. 1235-36.

 In fact we think this dialogue suggests either that the 
Department's request was always in the alternative or that it 
modified the request to make it such. "I think that is exactly 
how the Court should read it" comes in response to a 
suggestion that the petition be read as a request for specific 
enforcement, and the interest in clarification is presented as 
the Department's central concern. J.A. 1295. Given the 
district court's participation in the colloquy, we might be 
inclined, if necessary, to defer to its understanding of the 
Department's prayer for relief.

 Even if we found that the Department's request was in fact 
contingent on a finding of contempt, however, we do not think 
the district court would have erred in clarifying the decree 
sua sponte as an incident to its denial of the contempt 
petition. Contempt motions are often accompanied by re-
quests for clarification in the alternative. But they also often 

elicit declaratory clarifications, and sometimes even amend-
ments, as accompaniments to denials even without (so far as 
appears) explicit alternative requests for clarification. See, 
e.g., Wilder v. Bernstein, 49 F.3d 69, 71-72 (2d Cir. 1995); 
Thermice Corp. v. Vistron Corp., 832 F.2d 248, 250-51 (3d 
Cir. 1987); Gov't of the Virgin Islands v. Sun Island Car 
Rentals, Inc., 819 F.2d 430, 431 (3d Cir. 1987); Movie Sys-
tems, Inc. v. MAD Minneapolis Audio Distributors, Inc., 717 
F.2d 427, 429-30 (8th Cir. 1983); Vertex Distributing, Inc. v. 
Falcon Foam Plastics, Inc., 689 F.2d 885, 888 n.2, 892 (9th 
Cir. 1982); Stolberg v. Board of Trustees for State Colleges, 
541 F.2d 890, 892 (2d Cir. 1976); Red Ball Int. Demolition 
Corp. v. Palmadessa, 947 F. Supp. 116, 121 (S.D.N.Y. 1996); 
Johnson v. Heckler, 604 F. Supp. 1070, 1075-76 (N.D. Ill. 
1985).

 We are aware of no case raising doubts about the propriety 
of clarification incident to the denial of a contempt petition. 
Indeed, at oral argument Microsoft conceded "in principle" 
the court's authority to continue the proceeding in order to 
clarify the decree. Transcript at 11.4 Of course, the above 
cases characteristically did not explicitly affirm the district 
court's authority, although one did just that. See Vertex, 689 
F.2d at 892 ("[T]he district court could properly clarify that 
ambiguous language, and this it did, requiring defendants to 
change their future advertising to comply with the consent 
judgment, as clarified.").

 Microsoft points out that the question of district court 
authority is jurisdictional, so that mere practice may not be 
enough. But much repeated practice illumines the generally 
understood meaning of petitions for contempt citations. A 
court granting a clarification that the parties have not explic-
itly requested has at most construed the petition to contain an 

__________
 4 Microsoft then grounded its objection on the fact that the 
Department had urged the court "not to permit discovery, not to 
conduct an evidentiary hearing and to decide the matter on the 
papers before the District Court." Id. at 12. These objections, 
however valid, are completely independent of the theory we address 
here. As we find the preliminary injunction procedurally defective 
on other grounds, we need not reach them.

implicit request for declaratory relief. This construction 
seems altogether reasonable where, as here, the petition 
clearly puts the meaning of the consent decree in issue and 
the petition makes the standard request (in the rather typical 
words of this petition) for "such further orders as the nature 
of the case may require and as the Court may deem just and 
proper to compel obedience to and compliance with the orders 
and decrees of this Court." J.A. 43. Cf. Johnson, 604 
F. Supp. at 1075-76 (denying contempt petition but clarifying 
decree in response to request for further relief under 28 
U.S.C. s 2202).

 Because it was not error for the court to address the issue 
of clarification, we must decide whether the preliminary 
injunction was correctly granted.

 III.

 Microsoft argues that the district court failed to comply 
with Federal Rule of Civil Procedure 65(a)(1)'s command, "No 
preliminary injunction shall be issued without notice to the 
adverse party." We agree. Obviously the Department's 
request for a contempt citation provided no such notice, for 
the governing criteria are completely different. To defeat the 
contempt petition, all Microsoft had to do was to show that 
the Department failed to meet its burden of showing that the 
consent decree unambiguously barred its conduct. For a 
preliminary injunction, by contrast, traditional equitable stan-
dards would require the government to show substantial 
likelihood of success on the merits (here, that the decree, 
properly construed, barred the conduct), plus risk of irrepa-
rable injury, lack of substantial injury to the opposing party, 
and consistency with the public interest. See CityFed Finan-
cial Corp. v. Office of Thrift Supervision, 58 F.3d 738, 746 
(D.C. Cir. 1995). The contempt petition did not alert Micro-
soft to contest these factors.

 Nor could the Department's request for a permanent in-
junction serve as notice--even putting aside Microsoft's argu-
ment that the request was contingent on a situation that 
never arose (see section II). The request for a permanent 
injunction amounted to no more than a request for a clarifica-

tion, and thus would require only a showing that the Depart-
ment's reading of the consent decree was correct. It did not 
put into play the equitable factors of interim irreparable 
injury to the requester, harm to the party to be enjoined, and 
effects on the public interest. But resolution of these is 
essential in granting a preliminary injunction; the proponent 
must make a showing about the interim risks precisely in 
order to counterbalance the lack of any final ruling in its 
favor on the merits.

 At oral argument the Department claimed that when the 
government seeks a preliminary injunction under a statute, 
its showing of a likelihood of success on the merits supplants 
the normal need for assessment of the interim risks. This is 
true under some circumstances. First, it is clear that if a 
statute confers a right to an injunction once a certain showing 
is made, no plaintiff--neither governmental agencies nor pri-
vate parties--need show more than the statute specifies. 
See, e.g., Illinois Bell Telephone Co. v. Illinois Commerce 
Comm'n, 740 F.2d 566, 571 (7th Cir. 1984) (irreparable injury 
not required for preliminary injunction under 47 U.S.C. 
s 401(b), which provides that court "shall enforce" FCC order 
upon showing of disobedience). The statutory specification 
displaces the traditional equitable standards, but this dis-
placement is "not lightly assume[d]." Weinberger v. Romero-
Barcelo, 456 U.S. 305, 312 (1982). Plaintiffs must show that 
Congress intended to "intervene and guide or control the 
exercise of the courts' discretion." Id. at 313. See also 
Amoco Production Co. v. Village of Gambell, 480 U.S. 531, 
541-45 (1987).

 Second, and not entirely distinct in the cases, lurks the 
proposition that when a governmental entity sues to enforce a 
statute, irreparable injury is presumed to flow from the 
violation itself. See, e.g., United States v. Diapulse, 457 F.2d 
25, 27-28 (2d Cir. 1972) ("The passage of the statute is, in a 
sense, an implied finding that violations will harm the public 
and ought, if necessary, [to] be restrained."). It is unclear, 
however, whether such decisions actually turn on the identity 
of the plaintiff, or whether they are simply instances where 
the court read the statute as providing for injunction on a 


reduced showing and mentioned the enforcing agency because 
it happened to be the plaintiff before the court. As the cases 
did not purport to apply the doctrine to all statutes under 
which a government agency might seek relief, but limited it, 
for example, to "remedial" ones,5 see, e.g., Commodity Fu-
tures Trading Comm'n v. Muller, 570 F.2d 1296, 1300 (5th 
Cir. 1978), the latter seems more probable.

 Some cases antedating Romero-Barcelo took the view that 
mere statutory authorization of injunctive relief displaced 
equitable standards, see, e.g., Atchison, Topeka & Santa Fe 
Railway Co. v. Lennen, 640 F.2d 255, 259 (10th Cir. 1981) 
(citing cases). Under this view s 4 of the Sherman Act, 15 
U.S.C. s 4, authorizing such temporary injunctive relief "as 
shall be deemed just," but setting no standards for its award, 
would evidently be enough. But such cases seem outmoded 
by Romero-Barcelo's view that displacement of the usual 
equitable standards requires a "clear and valid legislative 
command." 456 U.S. at 313, quoting Porter v. Warner Hold-
ing Co., 328 U.S. 395, 398 (1946). In fact, even before 
Romero-Barcelo the Court construed s 4's grant as con-
trolled by the ordinary principles of equity courts. De Beers 
Consol. Mines v. United States, 325 U.S. 212, 218-19 (1945).

 In any event, the Department's suggestion is irrelevant. 
The preliminary injunction was entered in a suit to enforce a 
consent decree, not a statute. As the settlement of a litiga-
tion, the decree may require less than the statute under 
which the suit was brought, or more, United States v. Arm-
our & Co., 402 U.S. 673, 681-82 (1971); Ass'n for Retarded 
Citizens v. Thorne, 30 F.3d 367, 369 (2d Cir. 1994), so the 
violation of one is not necessarily a violation of the other. 

__________
 5 We have noted recently, and more than once, that the concept of 
a "remedial" statute is unhelpful. All statutes, unless purely declar-
atory, seek to "remedy" something about the pre-existing state of 
affairs. The cases seem bereft of references to "destructive" 
statutes. See East Bay Municipal Utility Dist. v. United States 
Dep't of Commerce, 1998 WL 210612 *5-*6 (D.C. Cir. 1998); Ober 
United Travel Agency, Inc. v. United States Dep't of Labor, 135 
F.3d 822, 825 (D.C. Cir. 1998).

Thus a finding of probable violation of the consent decree 
could not support a presumption of irreparable harm even 
under the most extravagant version of the doctrine the gov-
ernment invokes.

 So the district court did need to find irreparable injury 
before granting the preliminary injunction. The absence of 
notice had the effect of precluding the introduction of evi-
dence and argument on this requirement, and the omission 
was far from trivial. At oral argument the Department 
conceded that it had offered no evidence on the subject, and 
Microsoft suggested that it could have forcefully contested 
anything the Department might have offered, alluding to 
information--obviously not in the record--that no OEM had, 
since entry of the preliminary injunction, sought to take 
advantage of its terms. Transcript at 10, 61.6

 The purpose of Rule 65(a)(1)'s notice requirement is to 
allow the opposing party a fair opportunity to oppose the 
preliminary injunction, see Weitzman v. Stein, 897 F.2d 653, 
657 (2d Cir. 1990), and compliance is mandatory, Parker v. 
Ryan, 960 F.2d 543, 544 (5th Cir. 1992). Preliminary injunc-
tions entered without notice to the opposing party are gener-
ally dissolved. See, e.g., Williams v. McKeithen, 939 F.2d 
1100, 1105-06 (5th Cir. 1991); Weitzman, 897 F.2d at 657-68; 
Phillips v. Chas. Schreiner Bank, 894 F.2d 127, 130-31 (5th 
Cir. 1990). Appellate courts have, however, on occasion 
allowed a procedurally flawed injunction to remain in place 
pending a proper hearing on remand if the equities support 
such a disposition. See, e.g., Rosen v. Siegel, 106 F.3d 28, 33 
(2d Cir. 1997).

 The Department urges us to do so here. Evaluating such a 
request requires the court to consider the traditional equita-

__________
 6 The district court mentioned irreparable harm, but not in any 
terms suggesting focus on the relevant concern--whether denial of 
relief would result in harm to the competitive interests asserted by 
the government. It said that the Department is threatened with 
irreparable harm because "the cost of a compulsory unbundling of 
Windows 95 and IE in the future could be prohibitive," J.A. 1297, 
which seems rather more like a risk to Microsoft if it continues its 
current practice and ultimately loses in court.

ble factors as apparent on the existing record. See, e.g., 
Inverness Corp. v. Whitehall Laboratories, 819 F.2d 48, 51 
(2d Cir. 1987). We do not believe that a reviewing court 
must entertain such a request; if the record were so deficient 
as to make effective evaluation of the equities impossible, a 
court might do better simply to vacate the injunction as a 
matter of course--especially where, as here, the injunction 
was sought only rather obliquely. As later sections will show, 
however, the record here is enough for us at least to make a 
reasonable appraisal of the Department's eventual likelihood 
of success on the merits, and this factor proves dispositive. 
Silence at this stage would risk considerable waste of litiga-
tive resources. "When the district court's estimate of the 
probability of success depends on an incorrect or mistakenly 
applied legal premise, 'the appellate court furthers the inter-
est of justice by providing a ruling on the merits to the extent 
that the matter is ripe, though technically the case is only at 
the stage of application for preliminary injunction.' " Air 
Line Pilots Ass'n Int'l v. Eastern Air Lines, Inc., 863 F.2d 
891, 895 (D.C. Cir. 1988) (quoting Natural Resources Defense 
Council, Inc. v. Morton, 458 F.2d 827, 832 (D.C. Cir. 1972). 
When reviewing preliminary injunctions we have generally 
not been hesitant to offer interpretation and guidance on the 
substantive legal issues. See, e.g., Defenders of Wildlife v. 
Andrus, 627 F.2d 1238, 1243 (D.C. Cir. 1980); Energy Action 
Educational Found'n v. Andrus, 631 F.2d 751, 761 (D.C. Cir. 
1979); Maryland-National Capital Park & Planning 
Comm'n v. U.S. Postal Service, 487 F.2d 1029, 1041 (D.C. Cir. 
1973). We thus turn to the interpretation of s IV(E)(i), on 
which the merits of the Department's case depend. Our 
review of a district court's interpretation of a consent decree 
is de novo.7 See, e.g., Richardson v. Edwards, 127 F.3d 97, 

__________
 7 We agree with Judge Wald's suggestion, see Sep. Op. at 13-14, 
that there is something unusual about de novo review of a district 
court interpretation of an ambiguous provision of a consent decree. 
Consent decrees are generally interpreted as contracts. See Unit-
ed States v. ITT Continental Baking Co., 420 U.S. 223, 236-37 
(1975). Interpretation of an ambiguous contract term on the basis 
of extrinsic evidence is generally treated as a question of fact, and 


101 (D.C. Cir. 1997); United States v. Western Elec. Co., 12 
F.3d 225, 229 (D.C. Cir. 1993); United States v. Western Elec. 
Co., 900 F.2d 283, 293 (D.C. Cir. 1990) ("Triennial Review ").

 IV.

 Section IV(E) arose from a 1993 complaint filed with the 
Directorate General IV of the European Union ("DG IV") 
(the principal competition authority in Europe). Novell, a 
rival software vendor, alleged that Microsoft was tying its 
MS-DOS operating system to the graphical user interface 
provided by Windows 3.11. Before the introduction of Win-
dows 95, which integrated the two, Microsoft marketed the 
DOS component and the Windows component of the operat-
ing system separately, and Windows 3.11 could be operated 
with other DOS products. But Novell, which marketed a 

__________
the district court's findings as to the parties' intent are reviewed 
deferentially, i.e., reversed only for clear error. See, e.g., NRM 
Corp. v. Hercules, 758 F.2d 676, 682 (D.C. Cir. 1985). This court, 
however, has regularly engaged in de novo review of district court 
interpretations of concededly ambiguous provisions which the par-
ties sought to clarify with evidence from outside the decree itself. 
See, e.g., United States v. Western Electric Co., 12 F.3d 225, 229, 
231 (D.C. Cir. 1993) (announcing de novo review despite admitted 
ambiguity); United States v. Western Electric Co., 900 F.2d 283, 
293, 296 (D.C. Cir. 1990) ("Triennial Review") (same); see also id. 
at 294 (characterizing issue as "pure question of law"). Nor does 
the Supreme Court's opinion in ITT, which relies on the presence of 
ambiguity to distinguish Armour, see ITT, 420 U.S. at 238 & n.11, 
give any indication of deference. Of course, de novo review of legal 
analysis is in principle compatible with deference to factual findings. 
See Triennial Review, 900 F.2d at 293-94 (explaining that "aside 
from fact-finding, we owe no deference to the district court's 
decisions"); North Shore Laboratories Corp. v. Cohen, 721 F.2d 
514, 518-19 (5th Cir. 1983) (reviewing de novo while also noting 
deference to factual findings of parties' intent). This mixed ap-
proach may be the correct one, although the centrality of intent 
would often make the deference swallow the de novo review, a 
result our cases do not seem to contemplate. But here it would 
amount to de novo review anyway, as the district court made no 
findings of fact as to intent to which we could defer.

competing DOS product, DR-DOS, complained that by means 
of specific marketing practices--particularly "per processor 
and per system licenses," J.A. 754--Microsoft was creating 
economic incentives for OEMs to preinstall MS-DOS as well 
as Windows 3.11, thereby using its power in the market for 
DOS-compatible graphical user interfaces (where it com-
manded a near 100% market share) to affect OEM choice in 
the DOS market.8 J.A. 839-48.

 During June 1994 negotiations with the Department, Mi-
crosoft proposed the possibility of a joint settlement, and 
representatives of DG IV participated in meetings in Brussels 
and later in Washington, D.C. On July 15, 1994, the three 
sides reached agreement and Microsoft and the Department 
signed a stipulation agreeing to entry of the consent decree, 
including s IV(E). Both Microsoft and the Department char-
acterize s IV(E) as an "anti-tying" provision.

 Microsoft and the Department engage in a brief battle over 
the extent to which antitrust law may be relevant to this 
dispute. Without wasting time on the parties' somewhat 
exaggerated positions, we can simply say that Microsoft is 
clearly right that the decree does not embody either the 
entirety of the Sherman Act or even all "tying" law under the 
Act, and the Department is equally right to point out that the 
consent decree emerged from antitrust claims, unresolved 
though they were, so that we must keep procompetitive goals 
in mind in the interpretive task.

 As Armour makes clear, however, an antitrust consent 
decree cannot be read as though its animating spirit were 
solely the antitrust laws. "[T]he decree itself cannot be said 
to have a purpose; rather the parties have purposes, general-
ly opposed to each other, and the resultant decree embodies 
as much of those opposing purposes as the respective parties 

__________
 8 The indirect nature of the alleged tie may explain why 
s IV(E)(i) bars an agreement whose terms are "expressly or impli-
edly conditioned upon ... the licensing of any other Covered 
Product."


have the bargaining power and skill to achieve." 402 U.S. at 
681-82.

 The court's task, then, is to discern the bargain that the 
parties struck; this is the sense behind the proposition that 
consent decrees are to be interpreted as contracts. See, e.g., 
ITT Continental Baking Co., 420 U.S. at 236-37; Richard-
son, 127 F.3d at 101; Manufacturing Appeal, 894 F.2d at 
1390. To find the meaning of an ambiguous provision we look 
for the intent of the parties, just as we would with a contract. 
See Western Elec. Co., 12 F.3d at 231-32 (reading ambiguous 
provision of consent decree "in light of the parties' jointly 
intended purpose" (internal quotation omitted)); NRM Corp. 
v. Hercules, Inc., 758 F.2d 676, 681-82 (D.C. Cir. 1985) 
(contract interpretation). In that quest we may rely on the 
same aids to construction as we would when interpreting an 
ambiguous contract, including "the circumstances surround-
ing the formation of the consent order." See ITT, 420 U.S. at 
238.

 Section IV(E)(i) represented the parties' agreed "solution" 
to the problem posed by the Novell complaint. The practices 
complained of there, coupled with the decree's explicit accep-
tance of Windows 95, establish the competing models that 
guide our resolution of the present dispute. Whatever else 
s IV(E)(i) does, it must forbid a tie-in between Windows 3.11 
and MS-DOS, and it must permit Windows 95. Thus if the 
relation between Windows 95 and IE is similar to the relation 
between Windows 3.11 and MS-DOS, the link is presumably 
barred by s IV(E)(i). On the other hand, a counter-analogy 
is Windows 95 itself, which the decree explicitly recognizes as 
a single "product" (it defines it as a "Covered Product," 
s II(1)(v)), even though, as we have said, Windows 95 com-
bines the functionalities of a graphical interface and an oper-
ating system. If the Windows 95/IE combination is like the 
MS-DOS/graphical interface combination that comprises 
Windows 95 itself, then it must be permissible.

 The parties offer us little help in picking the correct 
analogy. Both propose readings of s IV(E)(i) that fail to 
reconcile its language with the facts of the Novell complaint 
and the later permissible release of Windows 95. The De-

partment claims that s IV(E)(i) prohibits Microsoft from 
bundling together a Covered Product and anything that "Mi-
crosoft simultaneously treats" and "antitrust law regards" as 
"a distinct commercial product." Department Br. at 37-38. 
It says that the browser-Windows pair is caught in the first 
filter (Microsoft's treatment of IE as a separate product) 
because Microsoft provides it separately to end users, sells 
versions of IE 4 for different operating systems, advertises 
IE 4, tracks its performance in a "browser market," and 
distributes it on a separate CD-ROM. J.A. 32-37. For 
antitrust criteria, the Department draws on Jefferson Parish 
Hosp. District No. 2 v. Hyde, 466 U.S. 2 (1984), for the 
proposition that products are distinct for tying purposes if 
consumer demand exists for each separately. (The Depart-
ment notes correctly that this does not require demand for 
one product without the other but simply demand for the two 
products from different sellers. See id. at 19 & n.30.)

 We are not convinced that these indicia necessarily point to 
separateness, especially those that depend on Microsoft's 
treatment. Microsoft plausibly characterizes the IE that it 
provides to end users as an operating system upgrade, as 
does its rival Netscape, J.A. 589, and the Department offers 
no means of distinguishing an upgrade from a separate 
product. Versions developed for different operating systems 
may be better understood as different products altogether; 
hence, their relevance to separateness is obscure. Distribu-
tion of software code on a separate CD-ROM shows nothing 
at all about whether the code is integrated into an operating 
system (software for an operating system that is clearly a 
single product may take up many disks).

 The Department's interpretation of the "integrated prod-
ucts" proviso does nothing to remedy its reading of the body 
of s IV(e)(i). On the Department's account, the proviso 
allows Microsoft to incorporate new features into an operat-
ing system and offer the package to OEMs--as long as it and 
antitrust law do not simultaneously treat those features as "a 
distinct commercial product." Department Br. at 37-38. But 
these are just the criteria deployed to argue that IE is an 
"other product"; if the proviso merely reiterates them (to say 


that what is not an "other product" is "integrated"), it does 
nothing. And while the Department says that the proviso 
would protect Microsoft from a charge that it had violated the 
decree by adopting a technology incompatible with other 
firms' products, Department Br. at 37 n.17, it is not apparent 
how s IV(E)(i)'s ban might prohibit such conduct nor how, if 
it did, the proviso on integration would help it. In short, the 
Department effectively reads the proviso out of s IV(e)(i).

 But the most immediate problem with this reading is that it 
produces the wrong result on the Novell allegations. In its 
attempts to define the "product" IE, the Department consis-
tently invokes the concept of "browser functionality." De-
partment Br. at 10; Department Motion for Contempt, J.A. 
1317-19; Department Reply Memorandum in Support of 
Motion for Contempt, J.A. 1424, 1429. But if functionality is 
the criterion of identity (which the Department asserts so as 
to claim that the "browser functionality" in Windows 95 is the 
same product as IE 4 for other operating systems), Windows 
95 looks like a tie-in of two products (MS-DOS and Windows 
3.11) that were sold separately in the market: it contains the 
functionalities of both. On the Department's reading, it 
should thus be prohibited unless Microsoft refrains from 
marketing MS-DOS separately. There is some suggestion 
that Microsoft has in fact continued to license MS-DOS 
separately, at least to end users. Microsoft Reply Br. at 15-
16. More significantly, the consent decree does not condition 
its approval of Windows 95 on Microsoft's marketing behavior 
with respect to MS-DOS. The failure to produce the right 
result when applied to Windows 95, one of the situations 
clearly resolved by the decree, is a fatal flaw.9

__________
 9 In rejecting the Department's use of functionality here we do 
not mean to suggest that it is never an appropriate criterion of 
identity. In some contexts it may be appropriate to treat as 
equivalent two products that supply the same functionality, if they 
meet the same demand. Computer programs written for different 
operating systems, however, do not seem to meet the same demand, 
so that acceptance of functionality as a sufficient criterion of 
identity would lead to odd results. Here, of course, the decree's 
acceptance of Windows 95 as a "product" rebuts the Department's 

 The interpretation that Microsoft advances most strongly 
suffers mirror-image defects: it lacks much logical sense and 
it fails to fit the decree's setting, the disposition of the Novell 
complaint. Microsoft stresses s IV(E)(i)'s "integrated prod-
ucts" proviso, saying that the addition of any feature to an 
operating system, as by simply putting the disk containing a 
compatible application in the same box with the operating 
system disk and requiring an OEM to install both, creates an 
integrated product--unless Microsoft also licenses the feature 
on a stand-alone basis "in the OEM channel."

 This interpretation neatly matches the failure of the De-
partment's theory to account for the permissibility of Win-
dows 95: Microsoft's reading would provide zero relief to 
Novell, for it would allow Microsoft to bundle MS-DOS with 
Windows 3.11 as long as it did not license MS-DOS separate-
ly to OEMs. In short, the Department's reading does not 
permit Windows 95, and Microsoft's does not prohibit a 
bundle of Windows 3.11 and MS-DOS. Neither can be the 
correct interpretation of a provision that was intended to do 
both.

 Curiously, in both parties' readings Microsoft's behavior 
determines the permissibility of conditioned licensing. This 
would be no defect if the behavior were in some way relevant 
to the economic principles of tie-ins. But it is not. The 
Department offers no theory as to how a seller's abstaining 
from separate marketing of the tied good might blunt the 
possible anticompetitive effects of bundling.10 It seems espe-
cially beside the point where the goods are complements used 
in fixed proportions. A monopolist who ties two such goods 
has no obvious reason to market the tied good separately: 
since all buyers of the tying good will also take the tied good, 
the residual market for the tied good will be minimal. If the 

__________
view of what is forbidden; one possible explanation might be that 
functionality works as an initial screen for defining products, but 
one that is trumped by the "integrated products" proviso.

 10 The hospital in Jefferson Parish surely did not offer the tied 
good (anesthesia) separately from the tying good (surgery), but this 
fact played no role in the Court's decision.

concern is that the tie-in makes it more difficult for competi-
tors to enter the market for the tying good (because they 
must also offer the tied good), see Grappone, Inc. v. Subaru 
of New England, 858 F.2d 792, 795-96 (1st Cir. 1988) (Breyer, 
J.), separate marketing of the tied good actually mitigates the 
posited harm by facilitating new entry into the market for the 
tying good. Thus both readings allow legitimation by behav-
ior that is either irrelevant or actively harmful.

 We think it quite possible, however, to find a construction 
of s IV(E)(i) that is consistent with the antitrust laws and 
accomplishes the parties' evident desires on entering the 
decree. The Department and DG IV were concerned with 
the alleged anticompetitive effects of tie-ins. Microsoft's goal 
was to preserve its freedom to design products that consum-
ers would like. Antitrust scholars have long recognized the 
undesirability of having courts oversee product design, and 
any dampening of technological innovation would be at cross-
purposes with antitrust law. Thus, a simple way to harmon-
ize the parties' desires is to read the integration proviso of 
s IV(E)(i) as permitting any genuine technological inte-
gration, regardless of whether elements of the integrated 
package are marketed separately.

 This reading requires us, of course, to give substantive 
content to the concept of integration. We think that an 
"integrated product" is most reasonably understood as a 
product that combines functionalities (which may also be 
marketed separately and operated together) in a way that 
offers advantages unavailable if the functionalities are bought 
separately and combined by the purchaser.

 The point of the test is twofold and may be illustrated by 
its application to the paradigm case of the Novell complaint 
and the subsequent release of Windows 95. First, "inte-
gration" suggests a degree of unity, something beyond merely 
placing disks in the same box. If an OEM or end user 
(referred to generally as "the purchaser") could buy separate 
products and combine them himself to produce the "integrat-
ed product," then the integration looks like a sham. If 
Microsoft had simply placed the disks for Windows 3.11 and 
MS-DOS in one package and covered it with a single license 


agreement, it would have offered purchasers nothing they 
could not get by buying the separate products and combining 
them on their own.11

 Windows 95, by contrast, unites the two functionalities in a 
way that purchasers could not; it is not simply a graphical 
user interface running on top of MS-DOS. Windows 95 is 
integrated in the sense that the two functionalities--DOS and 
graphical interface--do not exist separately: the code that is 
required to produce one also produces the other. Of course 
one can imagine that code being sold on two different disks, 
one containing all the code necessary for an operating system, 
the other with all the code necessary for a graphical interface. 
But as the code in the two would largely overlap, it would be 
odd to speak of either containing a discrete functionality. 
Rather, each would represent a disabled version of Windows 
95. The customer could then "repair" each by installing them 
both on a single computer, but in such a case it would not be 
meaningful to speak of the customer "combining" two prod-
ucts. Windows 95 is an example of what Professor Areeda 
calls "physical or technological interlinkage that the customer 
cannot perform." X Areeda, Elhauge & Hovenkamp, Antitrust Law s 1746b at 227, 
228 (1996).

__________
 11 The same analysis would apply to peripherals. If, for example, 
Microsoft tried to bundle its mouse with the operating system, it 
would have to show that the mouse/operating system package 
worked better if combined by Microsoft than it would if combined 
by OEMs. This is quite different from showing that the mouse 
works better with the operating system than other mice do. Com-
pare Sep. Op. at 1-2. See X Areeda, Elhauge & Hovenkamp, Antitrust Law p 1746b. 
Problems seem unlikely to arise with peripherals, because their 
physical existence makes it easier to identify the act of combination. 
It seems unlikely that a plausible claim could be made that a mouse 
and an operating system were integrated in the sense that neither 
could be said to exist separately. An operating system used with a 
different mouse does not seem like a different product. But 
Windows 95 without IE's code will not boot, J.A. 1623, and adding a 
rival browser will not fix this. If the add/remove utility is run to 
hide the IE 4 technologies, Windows 95 reverts to an earlier 
version, OEM service release ("OSR") 2.0. J.A. 1660-61.

 So the combination offered by the manufacturer must be 
different from what the purchaser could create from the 
separate products on his own. The second point is that it 
must also be better in some respect; there should be some 
technological value to integration. Manufacturers can stick 
products together in ways that purchasers cannot without the 
link serving any purpose but an anticompetitive one. The 
concept of integration should exclude a case where the manu-
facturer has done nothing more than to metaphorically "bolt" 
two products together, as would be true if Windows 95 were 
artificially rigged to crash if IEXPLORE.EXE were deleted. 
Cf. ILC Peripherals Leasing Corp. v. International Business 
Machines Corp., 448 F. Supp. 228, 233 (N.D. Cal. 1978) ("If 
IBM had simply bolted a disk pack or data module into a 
drive and sold the two items as a unit for a single price, the 
'aggregation' would clearly have been an illegal tying ar-
rangement.") aff'd per curiam sub nom. Memorex Corp. v. 
International Business Machines Corp., 636 F.2d 1188 (9th 
Cir. 1980); X Areeda, Elhauge & Hovenkamp, Antitrust Law p 1746 at 227 (discussing 
literal bolting). Thus if there is no suggestion that the 
product is superior to the purchaser's combination in some 
respect, it cannot be deemed integrated.12

 It might seem difficult to put the two elements discussed 
above together. If purchasers cannot combine the two func-
tionalities to make Windows 95, it might seem that there is 
nothing to test Windows 95 against in search of the required 
superiority. But purchasers can combine the functionalities 
in their stand-alone incarnations. They can install MS-DOS 
and Windows 3.11. The test for the integration of Windows 
95 then comes down to the question of whether its integrated 
design offers benefits when compared to a purchaser's combi-
nation of corresponding stand-alone functionalities. The de-
cree's evident embrace of Windows 95 as a permissible single 

__________
 12 Thus of course we agree with the separate opinion that "com-
mingling of code ... alone is not sufficient evidence of true inte-
gration." Sep. Op. at 4. Commingling for an anticompetitive 
purpose (or for no purpose at all) is what we refer to as "bolting."


product can be taken as manifesting the parties' agreement 
that it met this test.

 The short answer is thus that integration may be consid-
ered genuine if it is beneficial when compared to a purchaser 
combination. But we do not propose that in making this 
inquiry the court should embark on product design assess-
ment. In antitrust law, from which this whole proceeding 
springs, the courts have recognized the limits of their institu-
tional competence and have on that ground rejected theories 
of "technological tying." A court's evaluation of a claim of 
integration must be narrow and deferential.13 As the Fifth 
Circuit put it, "[S]uch a violation must be limited to those 
instances where the technological factor tying the hardware 
to the software has been designed for the purpose of tying 
the products, rather than to achieve some technologically 
beneficial result. Any other conclusion would enmesh the 
courts in a technical inquiry into the justifiability of product 
innovations." Response of Carolina, Inc. v. Leasco Response, 
Inc., 537 F.2d 1307, 1330 (5th Cir. 1976).

 In fact, Microsoft did, in negotiations, suggest such an 
understanding of "integrated." In response to the Depart-
ment and DG IV's statement of concern about tying, it 
asserted its right to "continue to develop integrated products 
like [Windows 95] that provide technological benefits to end 
users." J.A. 756 (emphasis added). Microsoft later withdrew 
this qualifying phrase, J.A. 760, in order, it claims, to avoid 
the application of "vague or subjective criteria"--though why 
the absence of criteria should cure a vagueness problem is 
unclear. But we do not think that removing the phrase can 

__________
 13 The separate opinion seems to take this reluctance to engage in 
the evaluation of product design as deference to Microsoft's inter-
pretation of the consent decree. See Sep. Op. at 2-3. It is nothing 
of the sort. We defer to neither party in interpreting the consent 
decree; in fact, we reject both parties' readings. We suggest here 
only that the limited competence of courts to evaluate high-tech 
product designs and the high cost of error should make them wary 
of second-guessing the claimed benefits of a particular design 
decision.

drain the word "integrated" of all meaning, and we do not 
accept the suggestion that the Department and DG IV bar-
gained for an "integrated products" proviso so boundless as 
to swallow s IV(E)(i). Significantly, Microsoft assured the 
Department and DG IV that the elimination of the qualifying 
phrase "did not represent a substantive change." J.A. 761.

 We believe this understanding is consistent with tying law. 
The Court in Eastman Kodak Co. v. Image Tech. Servs., 504 
U.S. 451 (1992), for example, found parts and service separate 
products because sufficient consumer demand existed to 
make separate provision efficient. See id. at 462. But we 
doubt that it would have subjected a self-repairing copier to 
the same analysis; i.e., the separate markets for parts and 
service would not suggest that such an innovation was really a 
tie-in. (The separate opinion, we take it, makes roughly the 
same point by its observation about digital cameras. See 
Sep. Op. at 3-4.) Similarly, Professor Areeda argues that 
new products integrating functionalities in a useful way 
should be considered single products regardless of market 
structure. See X Areeda, Elhauge & Hovenkamp, Antitrust Law p 1746b.14

 We emphasize that this analysis does not require a court to 
find that an integrated product is superior to its stand-alone 
rivals. See ILC Peripherals Leasing Corp. v. International 
Business Machines Corp., 458 F. Supp. 423, 439 (N.D. Cal. 
1978) ("Where there is a difference of opinion as to the 
advantages of two alternatives which can both be defended 
from an engineering standpoint, the court will not allow itself 
to be enmeshed 'in a technical inquiry into the justifiability of 
product innovations.' ") (quoting Leasco, 537 F.2d at 1330), 
aff'd per curiam sub nom. Memorex Corp. v. IBM Corp., 636 
F.2d 1188 (9th Cir. 1980). We do not read s IV(E)(i) to 
"put[ ] judges and juries in the unwelcome position of design-
ing computers." IX Areeda, Antitrust Law p 1700j at 15 (1991). 
The question is not whether the integration is a net plus but 
merely whether there is a plausible claim that it brings some 

__________
 14 The antitrust question is of course distinct. The parties agree 
that the consent decree does not bar a challenge under the Sher-
man Act.


advantage. Whether or not this is the appropriate test for 
antitrust law generally, we believe it is the only sensible 
reading of s IV(E)(i).

 On the facts before us, Microsoft has clearly met the 
burden of ascribing facially plausible benefits to its integrated 
design as compared to an operating system combined with a 
stand-alone browser such as Netscape's Navigator.15 Incor-
porating browsing functionality into the operating system 
allows applications to avail themselves of that functionality 
without starting up a separate browser application. J.A. 944, 
965.16 Further, components of IE 3.0 and even more IE 4--

__________
 15 This issue is peripheral on the Department's interpretation of 
s IV(E)(i), and the Department may not have contested it as 
vigorously as it might. The guidance this opinion seeks to provide 
is limited to setting out the legal framework for analysis. The 
ultimate sorting out of any factual disputes is a different question, 
and one we of course cannot resolve on the limited record before us.

 16 It is possible, of course, for applications vendors to bring about 
this Microsoft-created integration by distributing IE with their 
applications, which is apparently a relatively common practice. See 
J.A. 953, 966. Distribution by application vendors does not affect 
the conclusion that the integrated design brings benefits, nor does 
it suggest that IE has an existence apart from Windows 95. The 
consequence of this practice is simply that such applications up-
grade the purchaser's operating system to the Windows 95/IE level. 
The customer's act of installing the application implements Micro-
soft's prior integration of IE into Windows 95.

 The record also suggests that there are some inefficiencies associ-
ated with application vendors' redistribution of IE code. Applica-
tion vendors' affidavits assert that if the browser is installed in 
computers before sale, "installation of our product is faster, we have 
reduced product support issues, the perceived footprint (memory 
use) of our product is smaller, and in general customer perception 
of our product is better." J.A. 953, 966. Although the drawbacks 
of installation by applications vendors can be alleviated by OEMs' 
preinstalling an integrated operating system containing IE technol-
ogies, the drawbacks are not necessary consequences of a stand-
alone design, but rather incidental costs of a particular method of 
bringing about the benefits of integration, namely, distribution of 

especially the HTML reader--provide system services not 
directly related to Web browsing, enhancing the functionality 
of a wide variety of applications. J.A. 607-22, 1646-48. 
Finally, IE 4 technologies are used to upgrade some aspects 
of the operating system unrelated to Web browsing. For 
example, they are used to let users customize their "Start" 
menus, making favored applications more readily available. 
J.A. 490-95; 1662-64. They also make possible "thumbnail" 
previews of files on the computer's hard drive, using the 
HTML reader to display a richer view of the files' contents. 
J.A. 1664-69. Even the Department apparently concedes 
that integration of functionality into the operating system can 
bring benefits; responding to a comment on the proposed 
1994 consent decree (which the Department published in the 
Federal Register as required by the Tunney Act), it stated 
that "a broad injunction against such behavior generally 
would not be consistent with the public interest." 59 Fed. 
Reg. 59426, 59428 (Nov. 17, 1994).

 The conclusion that integration brings benefits does not 
end the inquiry we have traced out. It is also necessary that 
there be some reason Microsoft, rather than the OEMs or 
end users, must bring the functionalities together. See X 
Areeda, Elhauge & Hovenkamp, Antitrust Law p 1746b at 227; p 1747 at 229. Some 
more subtleties emerge at this stage, parallel to those encoun-
tered in determining the integrated status of Windows 95. 
Microsoft provides OEMs with IE 4 on a separate CD-ROM 
(a fact to which the Department attaches great significance). 
It might seem, superficially, that the OEM is just as capable 
as Microsoft of combining the browser and the operating 
system.

 But the issue is not which firm's employees should run 
particular disks or CD-ROMs. A program may be provided 
on three disks--Windows 95 certainly could be--but it is not 
therefore three programs which the user combines. Software 
code by its nature is susceptible to division and combination 
in a way that physical products are not; if the feasibility of 

__________
code by applications vendors. Thus they are not relevant to our 
comparison of the stand-alone and integrated designs.

installation from multiple disks meant that the customer was 
doing the combination, no software product could ever count 
as integrated. The idea that in installing IE 4 an OEM is 
combining two stand-alone products is defective in the same 
way that it would be nonsensical to say that an OEM install-
ing Windows 95 is itself "combining" DOS functionality and a 
graphical interface. As the discussion above indicates, IE 3 
and IE 4 add to the operating system features that cannot be 
included without also including browsing functionality. See 
J.A. 1661-68. Thus, as was the case with Windows 95, the 
products--the full functionality of the operating system when 
upgraded by IE 4 and the "browser functionality" of IE 4--
do not exist separately.17 This strikes us as an essential 
point. If the products have no separate existence, it is 
incorrect to speak of the purchaser combining them. Pur-
chasers who end up with the Windows 95/IE package may 
have installed code from more than one disk; they may have 
taken the browser out of hiding; 18 they may have upgraded 
their operating system--indeed, Netscape characterizes the 
installation of IE 4 as "really an OS [operating system] 

__________
 17 Our colleague's separate opinion suggests that IE may be 
separated from Windows 95 by treating some or all of the code that 
supplies operating system functionality as part of the operating 
system. Sep. Op. at 15. But apart from that code, there is nothing 
more to IE than the four lines of programming required to summon 
browsing functionality from code that also supplies operating sys-
tem functionality. J.A. 1654. Those four lines look more like a key 
to opening IE than anything that could plausibly be considered IE 
itself.

 18 The preliminary injunction, as construed by the parties' later 
stipulation, treats Microsoft as in compliance if it allows the options 
of (1) running the Add/Remove Programs utility with respect to IE 
3.x and (2) removing the IE icon from the desktop and from the 
Programs list in the Start menu and marking the file 
IEXPLORE.EXE "hidden." See above at p. 7. The injunction's 
evidently unique status as a remedy for a "tying" complaint, requir-
ing the defendant merely to allow an intermediary to hide the 
allegedly tied product, suggests the oddity of treating as separate 
products functionalities that are integrated in the way that Win-
dows 95 and IE are.

upgrade." J.A. 589. But they have not combined two dis-
tinct products.

 What, then, counts as the combination that brings together 
the two functionalities? Since neither fully exists separately, 
we think the only sensible answer is that the act of combina-
tion is the creation of the design that knits the two together. 
OEMs cannot do this: if Microsoft presented them with an 
operating system and a stand-alone browser application, rath-
er than with the interpenetrating design of Windows 95 and 
IE 4, the OEMs could not combine them in the way in which 
Microsoft has integrated IE 4 into Windows 95. They could 
not, for example, make the operating system use the brow-
ser's HTML reader to provide a richer view of information on 
the computer's hard drive, J.A. 1665--not without changing 
the code to create an integrated browser. This reprogram-
ming would be absurdly inefficient. Consequently, it seems 
clear that there is a reason why the integration must take 
place at Microsoft's level. This analysis essentially replays 
our comparison of Windows 95 to a bundle of MS-DOS and 
Windows 3.11 and concludes that the Windows 95/IE package 
more closely resembles Windows 95 than it does the bundle. 
The factual conclusion is, of course, subject to reexamination 
on a more complete record. On the facts before us, however, 
we are inclined to conclude that the Windows 95/IE package 
is a genuine integration; consequently, s IV(E)(i) does not 
bar Microsoft from offering it as one product.

 

 * * *

 A few words with respect to our colleague's separate 
opinion may clarify our position. Judge Wald suggests that 
"the prohibition and the proviso could reasonably be con-
strued to state that Microsoft may offer an 'integrated' 
product to OEMs under one license only if the integrated 
product achieves synergies great enough to justify Microsoft's 
extension of its monopoly to an otherwise distinct market." 
Sep. Op. at 3. We are at a loss to understand how a section 


that (1) articulates a prohibition and (2) sets a limit on the 
reach of the prohibition 19 can be read to state a balancing 
test. Apart from the lack of textual support, we think that a 
balancing test that requires courts to weigh the "synergies" 
of an integrated product against the "evidence of distinct 
markets," Sep. Op. at 5, is not feasible in any predictable or 
useful way. Courts are ill equipped to evaluate the benefits 
of high-tech product design,20 and even could they place such 
an evaluation on one side of the balance, the strength of the 
"evidence of distinct markets," proposed for the other side of 
the scale, seems quite incommensurable. Both Jefferson 
Parish and Eastman Kodak use their "distinct markets" 
analysis in a binary fashion: markets are distinct or they are 
not. See 466 U.S. at 21-22; 504 U.S. at 462. If, as the 
record suggests, Microsoft proposed modification of the inte-
gration proviso because of concern about "vague or subjective 
criteria," J.A. 760, an interpretation requiring courts to weigh 
evidence that establishes distinctness (or does not) against a 
sliding scale of net synergistic value looks like the most total 
transvaluation one can imagine.

 Institutional competence may not have been foremost in 
the parties' minds in drafting the consent decree, and judicial 
inability to apply a test does not ipso facto mean that the 
parties did not intend it. But if they did intend a balancing 
test, they kept that intent well hidden. Nothing in their 

__________
 19 The proviso may be read to do this either by clarifying the 
concepts of "Covered Product" and an "other product" to prevent 
an "integrated" product from constituting a forbidden duo, or by 
carving out an exception for integrated products even if they 
otherwise represent such a duo. We do not believe that the choice 
of approach makes a substantive difference.

 20 Our colleague seems to hint that one way to perform this 
evaluation is to examine whether the integrated product "over-
whelm[s]" the separate market. Sep. Op. at 10. But data on 
market performance will obviously not be available when the new 
product is introduced, and in any case, the overwhelming of the 
separate market is precisely what is feared and may simply indicate 
anticompetitive practices.

contemporaneous conduct (or in the conduct of anyone, at any 
time) suggests that they contemplated a balancing inquiry. 
Windows 95 was not subjected to any such analysis, though 
the markets it unified were substantial and obviously distinct. 
J.A. 790-96. Indeed, one might think that an especially 
compelling case would be required to "justify Microsoft's 
extension of its monopoly," Sep. Op. at 3, via Windows 95. 
Windows 95 leveraged Microsoft's Windows 3.11 market pow-
er into the operating system market, where network external-
ities are most apparent. See Microsoft, 56 F.3d at 1451. 
According to the separate opinion, Windows 95 should have 
required the utmost justification. But nothing suggests that 
it was analyzed that way, and it seems more likely that it 
passed muster not because the synergies of its integration 
outweighed the evidence of distinct markets but because it 
was, simply, integrated.

 The view expressed in the separate opinion seems sure to 
thwart Microsoft's legitimate desire to continue to integrate 
products that had been separate--and hence necessarily 
would have been provided in distinct markets. By its very 
nature "integration" represents a change from a state of 
affairs in which products were separate, to one in which they 
are no longer. By focusing on the historical fact of separate 
provision, the separate opinion puts a thumb on the scale and 
requires Microsoft to counterbalance with evidence courts are 
not equipped to evaluate. We do not think that this makes 
sense in terms of the text of the consent decree, the evidence 
of the parties' intents, the values the decree was presumably 
intended to promote, or the competence of the judiciary.

 

 * * *

 At this stage, then, the Department has not shown a 
reasonable probability of success on the merits. Given this 
failure, there is no reason to allow the preliminary injunction 


to remain in effect pending a proper hearing, and we reverse 
the district court's grant.

 V.

 Though the proceedings below may continue, they must do 
so without the preliminary injunction. With respect to the 
continuation, Microsoft argues that the "blanket" reference to 
a special master violates Article III, and, in the alternative, 
that the case does not present the exceptional circumstances 
required under Federal Rule of Civil Procedure 53(b) 21 and 
La Buy v. Howes Leather Co., 352 U.S. 249 (1957), to justify a 
nonconsensual reference. Future developments may moot 
this problem. In view of our interpretation of the consent 
decree, tentative though it be, see University of Texas v. 
Camenisch, 451 U.S. 390, 395 (1981); Taylor v. FDIC, 132 
F.3d 753, 766 (D.C. Cir. 1997), the Department may well 
regard further pursuit of the case as unpromising, especially 
given the alternate avenues developing in its recently 
launched separate attacks on Microsoft's practices, Nos. 
98-1232 and 98-1233. But no such mooting has yet occurred. 
Accordingly, we address the questions of whether mandamus 
is available to correct the asserted illegality in the reference 
and, if so, whether it should issue in this case. We answer 
yes to both.

 The Department claims that mandamus jurisdiction is lack-
ing. Its primary theory is evidently that an unlawful refer-
ence can be reached by mandamus only if it is so outrageous 
as to fail to "comport[ ] with Article III." Supplemental Br. 
of United States 9. But La Buy, the Supreme Court's 
authoritative pass at the use of mandamus to correct illegal 
references, rests simply on the presence of "an abuse of [the 
judge's] power under Rule 53(b)," 352 U.S. at 256, and on that 

__________
 21 The rule provides in relevant part: "A reference to a master 
shall be the exception and not the rule. In actions ... to be tried 
without a jury, save in matters of account and of difficult computa-
tion of damages, a reference shall be made only upon a showing 
that some exceptional condition requires it."

abuse being "clear," id. at 257. To be sure, La Buy observed 
that the court of appeals there confronted a district court 
"practice" of freewheeling references to masters: "[T]here is 
an end of patience." Id. at 258. But we have explicitly 
rejected the idea that mandamus is available only to correct 
"persistent disregard" of the limits on references. In re 
Bituminous Coal Operators' Ass'n, 949 F.2d 1165, 1168 n.4 
(D.C. Cir. 1991).

 Of course it may be that the boundaries of Rule 53(b) and 
Article III are close, so that the La Buy Court, in addressing 
the Rule 53 "exceptional condition[s]" criterion, was actually 
finding unconstitutional conduct. If true, this helps the De-
partment not at all. If mandamus is available only to correct 
unconstitutional abdications of Article III power, but a clear 
abuse of discretion under Rule 53 amounts to such an abdica-
tion, we may properly exercise mandamus jurisdiction if we 
find the same sort of clear abuse of discretion that the La 
Buy Court found.

 It is objected that a challenge at the end of the proceeding 
provides ample remedy, and black-letter mandamus law tells 
us that such adequacy of remedy defeats mandamus. In re 
Minister Papandreou, 1998 WL 163561 at *1 (D.C. Cir. 1998) 
(discussing mandamus criteria). See also Stauble v. Warrob, 
Inc., 977 F.2d 690, 693 & n.4 (1st Cir. 1992) (dictum to effect 
that "improvident" reference presents no danger of irrepara-
ble harm); In re Thornburgh, 869 F.2d 1503, 1508 (D.C. Cir. 
1989) (reference to a master for purposes of determining 
relief is not an "abdication of the total judicial power" such as 
to justify mandamus). But the Court's action in La Buy 
appears necessarily to depend on the view that, at least at 
some point, even the temporary subjection of a party to a 
Potemkin jurisdiction so mocks the party's rights as to render 
end-of-the-line correction inadequate.

 On the merits, the Department defends the reference on 
three grounds. First, it asserts that it falls within the well-


recognized category of references for purely remedial deter-
minations, such as the accountings and computations of dam-
ages, which Rule 53(b) expressly permits. Second, it claims 
that the technological complexity of the case and need for 
speed constitute "exceptional condition[s]" under the Rule. 
And third, it says that the order contains an implicit reserva-
tion by the district court of a power of de novo review, and 
that that unstated reservation saves the order.

 In saying that the reference was merely for purposes of 
supervising remediation the Department invokes the well-
established tradition allowing use of special masters to over-
see compliance. See generally Apex Fountain Sales, Inc. v. 
Kleinfeld, 818 F.2d 1089, 1097 (3d Cir. 1987) (citing cases). 
But this is not such a situation. The issue here is interpreta-
tion, not compliance; the parties' rights must be determined, 
not merely enforced. The matters referred to the master are 
no more "remedial" than would be those of any total referral 
of a contract case. The concern about nonconsensual refer-
ences turns on the determination of rights, not on a formalis-
tic division of the juridical universe into pre-trial, trial and 
post-trial. It is for this reason that special masters may not 
decide dispositive pretrial motions. See In re United States, 
816 F.2d 1083, 1090 (6th Cir. 1987).

 The Department also proposes that this is a case of such 
technological complexity as to be "exception[al]." So far as 
the meaning of the consent decree is concerned, that is 
clearly false; the words are in plain English, and if their 
meaning is not clear it is not because of some deep technolog-
ical issue but because of uncertainties in the purposes of the 
parties that drafted the decree, the sort of uncertainties that 
pervade contract actions. As for application of that meaning, 
we have just stated our interpretation, an interpretation that 
we regard as grounded, as are the related antitrust doctrines, 
in a realistic assessment of the institutional limits of the 
judiciary. Application of our reading of s IV(E)(i) does not 
require a software expert; it precludes Microsoft from any 


purely artificial "bolting" of functionalities but is otherwise 
deferential to entrepreneurs' product design choices.22

 More broadly, if La Buy was not complex, with its six 
defendants and nearly 100 plaintiffs (87 in one suit, six in 
another), 27 pages of docket entries in one of the cases for 
preliminary pleas and motions, over 50 depositions, and intri-
cate charges of monopolization and Robinson-Patman viola-
tions, 352 U.S. at 251-52, we see no reason to think of this 
case as especially complicated. In fact, it is very doubtful 
that complexity tends to legitimate references to a master at 
all. La Buy noted that the complexity of an antitrust case, 
rather than justifying a reference, "is an impelling reason for 
trial before a regular, experienced trial judge rather than 
before a temporary substitute appointed on an ad hoc basis 
and ordinarily not experienced in judicial work." Id. at 259.

 Thus the only remaining question is whether some implicit 
district court reservation of a power of de novo review of the 
special master's report, as to both fact and law, could save the 
reference. First, we find no such implied reservation. The 
order itself recites that "the Special Master shall receive 
evidence and legal authority presented by the parties at such 
times and places, and in such manner as he shall prescribe, 
and shall propose findings of fact and conclusions of law for 
consideration by the Court on the issues raised by this case." 
J.A. 1301 (emphasis added). The Department suggests that 
the use of "propose" is somehow helpful, and distinguishes 
the reference from that in Bituminous Coal, which invited 
"recommended findings of fact and conclusions of law." 949 
F.2d at 1166 (emphasis added). The difference in wording is 
immaterial, and in any event a special master's findings and 
conclusions are always advisory. Thus, even if we thought 

__________
 22 To the extent that adjudication may lead the court into deep 
technological mysteries, we note the court's power under Rule of 
Evidence 706 to appoint expert witnesses. Whether such an expert 
is appointed by agreement of the parties or not, the expert's 
exposure to cross-examination by both sides, see Rule 706(a), makes 
the device a far more apt way of drawing on expert resources than 
the district court's unilateral, unnoticed deputization of a vice-judge.

that a reservation of de novo review could save the reference 
we would have to vacate it, subject to possible re-issuance 
with an unequivocal commitment to non-deferential review. 
But we think, in fact, that no such rescue mechanism is 
available.

 Microsoft notes Rule 53(e)(2)'s instruction that in non-jury 
trials, "the court shall accept the master's findings of fact 
unless clearly erroneous." (emphasis added). It reads this, as 
have courts and commentators, as making deferential review 
mandatory. See, e.g., Williams v. Lane, 851 F.2d 867, 884 
(7th Cir. 1988); Apex Fountain, 818 F.2d at 1097; In re 
Crystal Palace Gambling Hall, 817 F.2d 1361, 1364 (9th Cir. 
1987); In re United States, 816 F.2d at 1087, 1088; 9A 
Charles A. Wright & Arthur R. Miller, Federal Practice & 
Procedure s 2605 at 670 (1995).

 The Department counters with a footnote from Stauble to 
the effect that a district court may refer fundamental issues 
of liability if he affords de novo review. 977 F.2d at 698 n.13. 
But compare id. at 698 n.12 (explaining that, because the 
parties have agreed that if the reference were constitutionally 
deficient the remedy would be remand for a full trial before 
the district court, the court will leave for "another day" the 
possibility that a master's findings on liability might "perhaps 
be salvaged, even after appeal, by having the district court 
conduct a deeper, more participatory sort of review."). At 
most, however, the thought reflected in the Stauble footnote 
might save a reference from invalidation under the Constitu-
tion; that possibility would do little to make it any less the 
sort of clear abuse of discretion that is fatal under La Buy. 
The same is equally true of the observation in United States 
v. Raddatz, 447 U.S. 667, 683 n.11 (1980), saying that the 
Court itself, in the exercise of its original Article III jurisdic-
tion, acts on the basis of special masters' reports. Clearly 
that practice tells us nothing about the presence of a clear 
abuse of discretion under Rule 53(b).

 We note some ambiguity on this point in our decision in 
Bituminous Coal. Our concluding directive told the judge to 
"revise his order of reference ... and to decide de novo, 


without deferring to a special master, all potentially disposi-
tive questions of fact or law." 949 F.2d at 1169. The 
Department thinks that this implicitly endorsed the possibili-
ty of a non-deferential reference. We think not. In Bitumi-
nous Coal we rejected the coal operators' suggestion that 
"any unconsented-to reference would constitute an abuse of 
judicial power," id. (emphasis added), but our rejection of that 
broad claim was based not on variations in scope of district 
court review but on our endorsement of the established and 
legitimate practice of using unconsented-to references for 
pretrial preparation or for implementation of remedies, id. 
And in the introductory summary of our disposition we said 
that the judge must "revise the order of reference to reserve 
for himself, and not delegate to the special master, the core 
function of making dispositive rulings, including findings of 
fact and conclusions of law on issues of liability." Id. at 1166. 
In short, when we said in Bituminous Coal that we were 
granting the writ "not because the district judge simply 
abused his discretion, but because he has no discretion to 
impose on parties against their will 'a surrogate judge,' " id. 
at 1168 (citations omitted), we effectively ruled out noncon-
sensual references in nonjury cases except as to peripheral 
issues such as discovery and remedy. Compare In re Armco, 
Inc., 770 F.2d 103, 105 (8th Cir. 1985) ("Beyond matters of 
account, difficult computation of damages, and unusual discov-
ery, it is difficult to conceive of a reference of a nonjury case 
that will meet the rigid standards of the La Buy decision.") 
(internal quotations omitted).

 In short, finding the case devoid of anything remotely 
"exceptional" within the meaning of Rule 53(b), we believe the 
reference to a master must be vacated. We do not, accord-
ingly, reach Microsoft's claims that the specific referee is 
biased or has conducted the proceedings on referral improp-
erly.

 VI.

 The preliminary injunction was issued without adequate 
notice and on an erroneous reading of s IV(E)(i) of the 


consent decree. We accordingly reverse and remand. The 
reference to the master was in effect the imposition on the 
parties of a surrogate judge and either a clear abuse of 
discretion or an exercise of wholly non-existent discretion. 
We grant mandamus to vacate the reference.

So ordered.

 Wald, Circuit Judge, concurring in part and dissenting in 
part: I depart from my colleagues only as to their interpre-
tation of the consent decree, which I believe unnecessarily 
narrows the scope of the inquiry that the district court may 
conduct on remand. First, the majority opinion appears to 
decide that there is only one reasonable interpretation of 
section IV(E)(i), notwithstanding the fact that we are remand-
ing for further factual development that may well be relevant 
to the most faithful interpretation of the section. Second, 
although the majority claims to have rooted its interpretation 
in antitrust law in accordance with the intent of the parties, it 
interprets section IV(E)(i) in a way that is, in fact, inconsis-
tent with at least some governing precedent. For these 
reasons, I write separately to suggest that there may be an 
interpretation of section IV(E)(i) more consonant with the 
intent of the drafters and the weight of antitrust law. If facts 
are found on remand to support such an alternative interpre-
tation, it should not be foreclosed by the majority opinion.

 Under the majority's interpretation, the proviso of section 
IV(E)(i), which says that section IV(E)(i) "in and of itself shall 
not be construed to prohibit Microsoft from developing inte-
grated products," is too safe a harbor with too easily naviga-
ble an entrance: So long as Microsoft has created a design to 
combine functionalities in a way that offers the ultimate user 
some "plausible" advantage otherwise unavailable, Microsoft 
may require OEMs to install the resulting creation in its 
entirety, without fear of running aground on the main prohi-
bition of section IV(E)(i) (which prohibits Microsoft from 
entering into any license agreement "in which the terms of 
that agreement are expressly or impliedly conditioned upon" 
the licensing of any "other product"). To my mind, this 
reading does not impose nearly enough scrutiny on "inte-
gration" and renders the central prohibition of section 
IV(E)(i) largely useless. Cf. Beal Mortgage, Inc. v. FDIC, 
132 F.3d 85, 88 (D.C. Cir. 1998) (noting the "cardinal inter-
pretive principle that we read a contract to give meaning to 
all of its provisions and to render them consistent with each 
other") (internal quotation omitted). The majority's interpre-
tation would not, for example, appear to prevent Microsoft 


from requiring OEMs to license the right to sell computer 
peripherals (e.g., mice) as a condition of licensing Windows 95 
so long as Microsoft had the prescience to include code in 
Windows 95 that made the cursor more responsive to the end-
user's touch than it would be with other mice. I think the 
majority would agree, however, that under any reasonable 
reading of section IV(E)(i), the tying of mice to Windows 95 
would clearly be prohibited.1 I fail to see why the analysis 
should be so different for software than for peripherals or 
why our "evaluation of a claim of integration must be [any 

__________
 1 The majority asserts that if Microsoft tried to bundle its mouse 
with the operating system, "it would have to show that the 
mouse/operating system package worked better if combined by 
Microsoft than it would if combined by OEMs," a test that is 
"different from showing that the mouse works better with the 
operating system than other mice do." Majority Opinion ("Maj. 
Op.") at 23 n.11. But this seems to me to misstate the majority's 
own test, which asserts that "the act of combination is the creation 
of the design that knits the two together" and not which firm's 
employees effect the physical combination. Id. at 28-30. If this is 
the case, then the majority's test would consider whether the design 
that "knits together" Microsoft's mouse and the operating system 
offers advantages unavailable through the combination of a competi-
tor's mouse and the operating system. This is, I think, a standard 
easily met. For instance, Microsoft could develop a mouse with a 
patented, modestly useful feature, design its operating system to 
work best when used with a mouse that had this feature, and then 
require OEMs to buy the two products together. The mouse and 
the operating system would qualify as integrated under the majori-
ty's test. The majority says that IE 4.0 and Windows 95 are 
integrated because the "full functionality of the operating system 
when upgraded by IE 4 and the 'browser functionality' of IE 4 ... 
do not exist separately." Id. at 29. Likewise, the full functionality 
of the patented mouse and Microsoft's mouse-friendly operating 
system would not exist separately; the two would be designed for 
each other, and their full functionality would only exist when 
combined. Thus, under the majority's test, Microsoft would have 
avoided the effect of section IV(E)(i) altogether, even if its patented 
mouse was of little extra value to the user. I would not think that 
the proviso was intended to swallow the consent decree in this way.

more] narrow and deferential," Maj. Op. at 25, for software 
than for other computer-related products. See, e.g., Fire-
stone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 112 (1989) 
(courts construe contractual provisions "without deferring to 
either party's interpretation"). Our role, after all, is to 
interpret the consent decree as we would a contract: in a 
manner that is "grounded in the text of the agreement and 
contemporaneous understandings of its purposes, not in our 
own conception of wise policy." United States v. Western 
Elec. Co., Inc., 846 F.2d 1422, 1427 (D.C. Cir. 1988).

 Another--some might say more--reasonable reading of 
section IV(E)(i) would give much greater weight to the main 
prohibition of the section. On its face, that prohibition for-
bids Microsoft from requiring OEMs to accept under one 
agreement any offering that is in reality two products: a 
"Covered Product" and, for purposes of this case, an "other 
product." The proviso, on the other hand, permits Microsoft 
to develop and license "integrated" products.2 Read togeth-
er, I think the prohibition and the proviso could reasonably be 
construed to state that Microsoft may offer an "integrated" 
product to OEMs under one license only if the integrated 
product achieves synergies great enough to justify Microsoft's 
extension of its monopoly to an otherwise distinct market.

 As I explain below, and as I read the majority opinion to 
agree, the consent decree was drafted against a backdrop of 
antitrust law. Under antitrust law, two products are consid-
ered distinct if there exists "sufficient consumer demand so 
that it is efficient for a firm to provide [the first product] 
separately from [the second]." Eastman Kodak Co. v. Image 
Technical Servs., Inc., 504 U.S. 451, 462 (1992). The difficul-
ty in this case is that technological evolution can change the 
boundaries of what is "efficient." For example, Eastman 
Kodak cites cameras and film as examples of two functionally 
linked products for which there exist separate markets. See 
id. at 463. But antitrust law presumably would not bar the 

__________
 2 The proviso states only that Microsoft is permitted to "develop" 
integrated products, but the parties agree that "develop" should not 
be limited to mere research and development.


development of digital cameras, which do not require film in 
any conventional sense.

 Thus, antitrust law cannot avoid determining whether a 
particular technological development has occurred because it 
is efficient or merely because it permits a monopolist to 
extend its monopoly to a new market. Software code is a 
particularly stark example of why such analysis is essential if 
antitrust concepts are to survive at all. Here, the majority 
effectively exempts software products from antitrust analysis 
by stating that "[s]oftware code by its nature is susceptible to 
division and combination in a way that physical products are 
not." Maj. Op. at 28. But this to me is an argument for 
closer, rather than more relaxed, scrutiny of Microsoft's 
claims of integration. An operating-system designer who 
wished to turn two products into one could easily commingle 
the code of two formerly separate products, arranging it so 
that "Windows 95 without IE's code will not boot," id. at 23 
n.11, so that Windows 95 without Internet Explorer would 
"represent a disabled version of Windows 95," id. at 23, and 
so that Internet Explorer instructs the Add/Remove function 
to leave so much of that program in place that "four lines of 
programming" will suffice to activate it, see id. at 29 n.17. 
This is not to say that commingling of code is per se perni-
cious or even suspicious. Rather, the point is that comming-
ling alone is not sufficient evidence of true integration; the 
courts must consider whether the resulting product confers 
benefits on the consumer that justify a product's bridging of 
two formerly separate markets.

 Although this task is difficult, it is by no means the 
impossible project that the majority suggests. As I explain 
below, traditional antitrust analysis, and the usual methods of 
the law, provide the courts with a range of ways to address 
the ultimate question of efficiency. See, e.g., PSI Repair 
Servs., Inc. v. Honeywell, Inc., 104 F.3d 811, 817 (6th Cir. 
1997), cert. denied, 117 S. Ct. 2434 (1997) (citation omitted) 
("While we are mindful of the various efficiency gains that 
can accrue to both suppliers and consumers from bundling 
certain products together, we are confident that the antitrust 
laws provide the tools to distinguish between meritorious and 


non-meritorious claims."). As I see it, the efficiency calculus 
takes two factors into account. The first is evidence that 
there are real benefits to the consumer associated with 
integrating two software products; I call these benefits "syn-
ergies." 3 The second is independent evidence, of the type 
that is usually employed in antitrust analysis, that a genuine 
market exists for the two products provided separately. For 
example, Windows 95 includes a built-in calculator program 
with relatively few functions. Although there may be few 
synergies associated with building this program into the 
operating system, there is also not likely to be much of a 
market for this program provided separately, and this factor 
must be taken into account. Market evidence of demand for 
independent products will spare the courts from the need to 
speculate in the abstract about considerations of efficiency.

 Taken together, then, these two factors generate a balanc-
ing test. The greater the evidence of distinct markets, the 
more of a showing of synergy Microsoft must make in order 
to justify incorporating what would otherwise be an "other" 
product into an "integrated" whole. If the evidence of dis-
tinct markets is weak, then Microsoft can get by with a fairly 
modest showing (although perhaps not the minimal showing 
required by the majority). But if there are clearly two 
distinct markets, then Microsoft would need to demonstrate 

__________
 3 The majority questions the institutional competence of the 
courts to judge the level of synergy provided by an "integrated" 
product. See Maj. Op. at 25. By no means do I endorse routine 
judicial intervention in the details of product design. But I also do 
not endorse (as the majority comes close to doing) judicial abdica-
tion in the face of complexity. The courts are certainly capable of 
determining whether a particular integration offers any synergistic 
benefits at all and whether these benefits are minimal, significant, 
or great. As this is a factual determination, they may be guided in 
this effort by, for example, affidavits, consumer surveys, and other 
evidence presented by the parties as well as testimony from experts 
selected by the parties or by the court. Certainly this approach is 
preferable to the majority's proposal, under which antitrust law 
surrenders to any bona fide assertion of a "plausible" benefit of 
integration.

substantial synergies in order to compel OEMs to accept a 
new "integrated" product that bridges those markets. In 
other words, the decree does not purport to chill Microsoft's 
technological development of its products by prohibiting a 
product outright merely because it incorporates new fea-
tures--the proviso makes clear that Microsoft is free to 
design such products and to market their benefits to OEMs 
such that OEMs overwhelmingly choose the new product over 
a competitor's product.4 The proviso thus becomes a safe 
harbor only for those integrations in which the "other prod-
uct" has been (legitimately) technologically subsumed in a 
greater whole.5

__________
 4 During his tenure as special master in this case, Lawrence 
Lessig offered a similar, although not identical, interpretation of 
section IV(E)(i) in a letter that has been made part of the record in 
this appeal. See Letter from Lessig to Malone et al., January 19, 
1998 (asserting that the prohibition of section IV(E)(i) forbids only 
tying through contract; it does not, as the proviso makes clear, 
forbid tying through technological efforts). The fact that Professor 
Lessig has proposed this quite plausible alternate interpretation of 
section IV(E)(i) does not, of course, suggest that his interpretation 
is the only acceptable one--that is a matter for the proceedings on 
remand to determine.

 5 The majority expresses puzzlement as to how a section "that (1) 
articulates a prohibition and (2) sets a limit on the reach of the 
prohibition" can be read to state a balancing test. Maj. op. at 31. 
As I read section IV(E)(i), its application turns on distinguishing 
two products from a single, integrated product. The section surely 
requires that the product be legitimately integrated; otherwise, 
section IV(E)(i) would have no force. One plausible interpretation 
of the decree is that it refers the court to antitrust law to decide 
whether a product is legitimately integrated; in these circum-
stances, the antitrust analysis requires balancing. For my part, I 
am at a loss to understand how a consent decree that is clearly 
intended to limit Microsoft's conduct could be read to impose so 
little scrutiny of that conduct.

 One might ask why, under my proposed reading, section IV(E)(i) 
contains a proviso at all. I think it possible that the proviso was 
intended, "in the intensely lawyered atmosphere surrounding this 
decree, to make assurance doubly sure," United States v. 

 Thus, the real question for purposes of determining if a 
violation of the degree has taken place is whether a new 
combination of formerly separate functionalities still contains 
an "other product" or if the two functionalities have been 
legitimately blended, or "integrated," and so have lost their 
former identities and become one product to which the prohi-
bition no longer applies. (This, of course, is a factual ques-
tion to be explored on remand.) As I have already suggested, 
and as the majority agrees, given the context in which section 
IV(E)(i) arose, it is appropriate to look to antitrust law as a 
guide to determining when such integration occurs. Al-
though the majority opinion claims that its construction is 
consistent with antitrust law, see Maj. Op. at 22, it does not, 
in my view, give due weight to the Supreme Court's holding 
in Jefferson Parish Hospital District No. 2 v. Hyde, 466 U.S. 
2 (1984), the leading guide to the separate product determina-
tion.6 In Jefferson Parish, the Court considered whether 
anesthesiological services, which a hospital had required pa-
tients to take only from certain anesthesiologists, were in fact 
separate products from the other services provided by the 
hospital or, rather, were part of what the hospital claimed 
was a "functionally integrated package of services." Id. at 19. 

__________
 Western Elec. Co., Inc., 12 F.3d 225, 238 (D.C. Cir. 1993) (Williams, 
J., dissenting)--in other words, that it was a lawyerly redundancy. 
I do not think, however, that it is necessary to read the proviso as 
serving so limited a function. Under my reading, the proviso 
serves to clarify that the prohibition of section IV(E)(i) is not 
boundless--that a product is not barred simply because it contains 
new combinations of previously existing functionalities. The provi-
so thus functions to eliminate one possible reading of section 
IV(E)(i). Given that the proviso is cast in terms of interpretation--
it says that section IV(E)(i) "shall not be construed" to bar integrat-
ed products--it is appropriate to accord it this limited, interpretive 
function.

 6 The majority rejects DOJ's contention that a product is separate 
if Microsoft so treats it, see Maj. Op. at 19-20, but it does not 
address the government's associated contention that a product is 
separate if antitrust law so treats it, see id. at 19 (noting DOJ's 
citation of Jefferson Parish).


In rejecting the hospital's argument that such a package did 
not involve a tying arrangement, the Court held that "the 
answer to the question whether one or two products are 
involved turns not on the functional relation between them, 
but rather on the character of the demand for the two items." 
Id. Thus, the fact that the hospital provided "the space, 
equipment, maintenance, and other supporting services neces-
sary to operate the anesthesiology department," purchased 
the necessary drugs and supplies, and furnished the required 
nursing personnel, id. at 6, did not prevent a finding of 
separateness, nor did the district court's conclusion that the 
hospital believed that a "closed system" anesthesiology de-
partment "resulted in the best quality of patient care." Hyde 
v. Jefferson Parish Hosp. Dist. No. 2, 513 F. Supp. 532, 540 
(E.D. La. 1981). In other words, despite the overlap between 
the services provided by the hospital and those provided by 
the anesthesiologist, and despite the claimed benefits of an 
"integrated" relationship, the Court held that the proper 
focus of analysis was whether the arrangement tied two 
distinct markets for products that are separate from the 
buyer's perspective. See Jefferson Parish, 466 U.S. at 19-20 
(citing Times-Picayune Publishing Co. v. United States, 345 
U.S. 594 (1953), and Fortner Enters. v. United States Steel 
Corp., 394 U.S. 495 (1969)). It is not clear to me why this 
analysis should be markedly less applicable in the technologi-
cal context; indeed, the post-Jefferson Parish trend is to 
apply its test even in the technological realm. See, e.g., 
Allen-Myland, Inc. v. International Bus. Machs. Corp., 33 
F.3d 194, 211-12 (3d Cir. 1994) (computer parts and installa-
tion); Service & Training, Inc. v. Data Gen. Corp., 963 F.2d 
680, 684 (4th Cir. 1992) (diagnostic software and mainte-
nance/repair service); Digidyne Corp. v. Data Gen. Corp., 734 
F.2d 1336, 1339 (9th Cir. 1984) (central processing units and 
operating system); cf. Jefferson Parish, 466 U.S. at 25 n.42 
("In the past, we have refused to tolerate manifestly anticom-
petitive conduct simply because the health care industry is 
involved.").

 The tying analysis is, of course, a pragmatic one. For 
example, no one would claim that tying law was violated by 
the practice of selling shoes in pairs despite the possible 
existence of some market for only left shoes (among those 

with only one foot, for example, or with differently sized feet). 
Likewise, it is in all likelihood not a tying violation for 
Jefferson Parish's hospital to require that patients accept the 
hospital's receptionists (instead of bringing their own) and 
accept the cleaning services and meals provided in their 
rooms (instead of making other arrangements) and to charge 
patients for these services. This is so even though there 
might be a limited group of patients who would prefer to 
make their own arrangements for receptionists, cleaning, and 
meals. Cf. Jefferson Parish., 466 U.S. at 22 n.36 (noting that 
the antitrust analysis might differ for "radiologists, patholo-
gists, and other types of hospital-based physicians"); see also 
Jack Walters & Sons Corp. v. Morton Bldg., Inc., 737 F.2d 
698, 703 (7th Cir. 1984) (noting that "[t]he practice has been 
to classify a product as a single product if there are rather 
obvious economies of joint provision"). In the case of the 
shoes, the receptionist, and the cleaning, a judgment is made 
that the benefits of joint provision clearly predominate over 
what is undoubtedly a minimal separate market (if one can be 
said to exist at all). In the case of the anesthesiologist, by 
contrast, the Court found that the claimed benefits--24-hour 
anesthesiology coverage, flexible scheduling, and facilitation 
of work routine, professional standards, and equipment main-
tenance--were not sufficient to justify joint provision because 
there was a very substantial market for anesthesiologists' 
services and because these benefits could be achieved without 
the forced tie (by, for example, promoting the benefits of the 
hospital's anesthesiologists to patients and setting standards 
of compatibility). See Jefferson Parish, 466 U.S. at 25 n.42. 
Under this doctrine, then, an "integrated" product cannot 
simply be one where some benefit exists as a result of joint 
provision, since the hospital easily met this standard. Rath-
er, "integration" must mean something more: a combination 
of functionalities in which the synergies created predominate 
over the existence of a separate market--in other words, 
where the benefits of the combination dissuade consumers 
from seeking and suppliers from providing the alleged "tied" 
product.7

__________
 7 As to the majority's observation that a product is not "integrat-
ed" if OEMs could perform the integration equally well on their 


 This alternative interpretation of section IV(E)(i) also ac-
commodates the majority's "paradigm" case. The mere pro-
vision of Windows 3.11 and DOS 6.22 as a single product may 
have created some benefits--reduction of transaction costs, 
guaranteed compatibility, and a single source of customer 
support services, for example. These benefits were not, 
however, enough to overwhelm the existence of a separate 
operating system market--indeed, the very presence of No-
vell's product as an operating system to be used with Win-
dows 3.11 suggests the existence of such a market. See, e.g., 
J.A. 845 (DG IV Statement of Objections) ("Such tying affects 
the competitive freedom of the licensee to find a better 
substitute or obtain better terms for the operating system to 
be used with Windows."). Windows 95, however, is a differ-
ent matter. In that case, the whole is clearly greater than 
the sum of its parts--as the majority notes, "it is not simply a 
graphical user interface running on top of MS-DOS." Maj. 
Op. at 23. And it is clear on the present record that 
Microsoft, at least, understood Windows 95 to provide such 
benefits. See, e.g. J.A. 1101 (Microsoft's "Windows 95 Fea-
ture Review") ("When you first boot Windows 95 it is immedi-
ately apparent that the old world of Windows running on top 
of MS-DOS is no more."). Thus, the synergistic benefits 
appear to have been large enough so that it would have been 
reasonable for DOJ to agree to treat Windows 95 as an 
integrated product.8

__________
own, my only comment is that this is an obvious point, and I am 
unclear what it adds to the analysis. A synergy should only count 
as such if it has benefits that the purchaser could not achieve 
equally well on his own. For example, there are synergistic bene-
fits to combining cookies and milk, but a consumer can achieve 
them perfectly well at home. Thus, a supermarket could not 
ordinarily invoke this synergy as a justification for requiring cook-
ies and milk to be bought together.

 8 The majority objects that there is no evidence that Microsoft 
and DOJ subjected Windows 95 to a balancing analysis. Maj. Op. 
at 31-32. Because of the procedural posture of this case, however, 
there is little evidence of any kind in the record as to what the 
parties to the consent decree intended. There is certainly no 

 The majority's interpretation, however, departs from this 
precedent by accepting any "plausible claim" that the combi-
nation (i.e., the design) offers "some advantage." Maj. Op. at 
26-27. Of course, both the majority's interpretation and my 
alternative proposal would discredit any specious claims of 
integration--Microsoft's claim that it could simply put two 
disks in the same box and claim integration, for example, see 
id. at 21, would hardly merit a second thought. But the 
majority's considerable deference to Microsoft's plausible 
claims of advantage, coupled with Microsoft's privileged 
knowledge of the inner workings of its operating system, 
barely raises the bar of section IV(E)(i) above ground level. 
It is difficult to imagine how Microsoft could not conjure up 
some technological advantage for any currently separate soft-
ware product it wished to "integrate" into the operating 
system.9 And for the majority, the chase ends there: Inter-
net Explorer, it contends, shares code with the operating 
system in a way that other browsers do not, and therefore it 
is integrated. But the fact that parts of Internet Explorer 
share code with the operating system and thus with other 
applications should not end the analysis any more than did 

__________
indication that Microsoft and DOJ subjected Windows 95 to the 
majority's minimal test.

 9 The majority's test would seem to permit Microsoft to "inte-
grate" word-processing programs, spreadsheets, financial-
management software, and virtually any other now-separate soft-
ware product into its operating system by identifying some minimal 
synergy associated with such "integration." In effect, the majority 
has fashioned a broad exemption from the antitrust laws for operat-
ing system design, apparently because an operating system is not 
like a peripheral, whose "physical existence makes it easier to 
identify the act of combination." Maj. Op. at 23 n.11. Surely, 
however, physical existence cannot serve as a limitation to the 
application of antitrust law--the provision of services, for example, 
is a mutable "product" without tangible existence and yet has often 
been the subject of antitrust analysis. See, e.g., Jefferson Parish, 
466 U.S. 2 (anesthesiological services); Allen-Myland, 33 F.3d 194 
(installation of computer parts); Service & Training, 963 F.2d 680 
(computer maintenance and repair services).


the fact that the anesthesiologists in Jefferson Parish shared 
hospital equipment and personnel with the hospital and its 
staff (or that the hospital could identify some minor practical 
benefits to requiring the use of only certain anesthesiolo-
gists). The analysis must also consider whether Internet 
Explorer is a separate product under antitrust law, that is, 
whether "consumers differentiate between [Internet Explor-
er] and [Windows 95]" such that consumers desire to pur-
chase--and hence that manufacturers desire to supply--a 
substitute for Internet Explorer from another manufacturer; 
in other words, whether there is "a distinct product market in 
which it is efficient to offer [the tied product] separately from 
[the tying product]." Jefferson Parish, 466 U.S. at 22; see 
also Digidyne, 734 F.2d at 1339 ("[t]he undisputed facts 
summarized in the district court's opinion establish that a 
demand existed for NOVA instruction set CPUs [central 
processing units] separate from defendant's RDOS [operating 
system], and that each element of the NOVA computer 
system could have been provided separately and selected 
separately by customers if defendant had not compelled 
purchasers to take both"). Whether such a market exists, 
and whether it is significant enough to outweigh the particu-
lar synergies associated with integrating IE 3.0 and/or IE 4.0 
into Windows 95, is, of course, a factual determination within 
the province of the district court. Relevant indicators in the 
market analysis, however, would surely include (1) whether 
manufacturers of other operating systems require OEMs to 
include a particular browser, see, e.g., Jefferson Parish, 466 
U.S. at 23 n.39 (noting that "other hospitals often permit 
anesthesiological services to be purchased separately"); X 
Areeda, Antitrust Law p 1746, at 225 (1996) (suggesting 
comparison of alleged tie with practices in analogous competi-
tive markets); (2) whether Microsoft's own actions reflect a 
perception of a competitive market for "Internet Explorer" 
separate from the market for Windows 95, see, e.g., Allen-
Myland, 33 F.3d at 208-09 (noting probative value of internal 
reports in determining distinct product markets); and even 
(3) the very existence of competitor browser manufacturers, 
see, e.g., Eastman Kodak, 504 U.S. at 462 (noting that "the 


development of the entire high-technology service industry is 
evidence of the efficiency of a separate market for service"). 
The majority opinion, however, relies on none of these consid-
erations. By discounting the relevance of such analysis, the 
majority in fact shorts traditional antitrust law.

 Despite the plausibility of this alternative interpretation, 
the extent to which antitrust law was intended to inform the 
interpretation of the decree--specifically the interpretation of 
the terms "integrated product" and "other product"--is an-
other question best left open to the district court on remand. 
Everyone agrees, I believe, that section IV(E)(i) of the decree 
is ambiguous--indeed, had it been unambiguous, the district 
court could have fished or cut bait, i.e., it could have deter-
mined either that Microsoft's actions constituted contempt or 
that they did not violate the decree at all. Thus, I do not 
read the majority opinion to say at any point that there is a 
plain meaning of section IV(E)(i) that can be located in the 
text alone. To the contrary, we are relegated to ordinary 
principles of contract law: searching for the parties' intent 
and guided in that adventure by "conventional 'aids to con-
struction,' including the 'circumstances surrounding the for-
mation of the consent order, any technical meaning words 
used may have had to the parties, and any other documents 
expressly incorporated in the decree.' " United States v. 
Western Elec. Co., 894 F.2d 430, 434 (D.C. Cir. 1990) (quoting 
United States v. ITT Continental Baking Co., 420 U.S. 223, 
238 (1975)). Under these principles, the interpretation of an 
ambiguous contract involves factual findings as to the parties' 
intent. See, e.g., Bennett Enters., Inc. v. Domino's Pizza, 
Inc., 45 F.3d 493, 497 (D.C. Cir. 1995); Carey Canada, Inc. v. 
Columbia Cas. Co., 940 F.2d 1548, 1553-54 (D.C. Cir. 1991). 
In non-plain meaning cases such as this one, appellate courts 
generally decline to embark on their own factfinding mission, 
deferring to the district court's role as the primary factfinder 
and reviewing its findings only for clear error. See, e.g., 
United States v. Insurance Co. of N. Am., 131 F.3d 1037, 
1042-43 (D.C. Cir. 1997) (declining to determine intent of 
parties to contract on the basis of incomplete record and 


remanding for further findings). While the district court 
below did conclude that "[r]eading [section] IV(E)(i) in light 
of its avowed purpose raises a logical inference that the 
parties anticipated the use of [tying law] antitrust precedents 
in determining the application of [section IV(E)(i)] to the 
conduct the government challenges here," United States v. 
Microsoft Corp., 980 F. Supp. 537, 542 (D.D.C. 1997)--a 
conclusion that suggests that Jefferson Parish, decided well 
before the parties' agreement, is indeed relevant to the 
construction of the decree--it is not inconceivable that, given 
notice and an adequate opportunity to present evidence and 
arguments, the parties will succeed in persuading the district 
court otherwise.10 The majority opinion, however, leaves 
little room for such efforts--its interpretation seems clearly 
meant to be the last word.11

 Finally, and relatedly, I note that when the parties' contem-
poraneous understanding of section IV(E)(i) is ultimately 
revealed, there is further work to be done on how the parties 
intended that understanding to be applied. Should the dis-
trict court conclude that whether something is an "other 
product" depends on the existence of a separate market for 
that product, it must still determine how that "something" is 
defined--in this case, "Internet Explorer." Here, again, the 
majority relies heavily on a presumption that "Internet Ex-
plorer" contains code that upgrades the operating system as 
well as code that enables end-users to access the Internet and 
therefore concludes that there is no "separate" product for 
any tie-in analysis. See Maj. Op. at 29.12 The validity of that 

__________
 10 Indeed, the district court acknowledged that "[d]isputed issues 
of technological fact, as well as contract interpretation, abound as 
the record presently stands." Microsoft, 980 F. Supp. at 543.

 11 The majority's assertion that "the district court made no find-
ings of fact as to intent to which we could defer," Maj. Op. at 15 n.7, 
makes restraint particularly appropriate.

 12 Notably, the majority's assertion to this effect relies on testi-
mony presented by Microsoft during hearings on whether Microsoft 
had failed to comply with the preliminary injunction, testimony that 
was challenged by the government. See Maj. Op. at 29 (citing, e.g., 
J.A. 1661-68). The parties' eventual settlement of this dispute, see 

perception is not so evident to me. The fact that the supplies 
and equipment that made the anesthesiologist's job possible 
in Jefferson Parish remained at the hospital--that, in a 
manner of speaking, the anesthesiologist was something of an 
interface between the end-user patient and the hospital's 
"operating system"--did not prevent the Court from conclud-
ing that his portion of the service constituted a separate 
product. Unfortunately, perhaps due to the irregular nature 
of the preliminary injunction proceedings, the district court 
made little in the way of findings concerning what the linch-
pin product "Internet Explorer" is intended to encompass.13 
It would not be unreasonable, as the prior discussion sug-
gests, to approach the problem from the perspective of a 
typical end-user, who most likely regards "Internet Explorer" 
as a particular vehicle for accessing information on the Inter-
net, regardless of the underlying code associated with that 
process. The fact that, as the majority suggests, see Maj. Op. 
at 29-30, "Internet Explorer" distributes certain code to the 
operating system may simply suggest that some or all of this 
code should not be considered part of "Internet Explorer" at 
all but part of the operating system. Or perhaps the work 
that this code does could be done equally well by similar code 
written by Netscape or some other competitor, in which case 
the code's function is not necessarily an operating system 

__________
J.A. 1780 (Stipulation and Order), obviated any need for factual 
findings on this issue by the district court. Given that much of the 
testimony involved in-court demonstrations, see, e.g., J.A. 1661-72, I 
believe that it would be premature for this court to weigh in with its 
own resolution of this factual dispute.

 13 The district court's opinion does refer to one unit of analysis as 
"the software code that Microsoft itself now separately distributes 
at retail as 'Internet Explorer 3.0,' " Microsoft, 980 F. Supp. at 544, 
but the usefulness of this description was called into question in 
subsequent proceedings. See J.A. 1619 (assertion by Microsoft 
executive that it distributed no product at retail titled "Internet 
Explorer 3.0"); J.A. 1780 (agreement by DOJ and Microsoft that 
removal of only certain files would comply with preliminary injunc-
tion).


function at all.14 Which approach to the meaning of "prod-
uct" was the contemporaneous understanding of the parties to 
the decree, however, remains to be determined.

 Furthermore, the record suggests that many of the benefits 
that the majority asserts for the incorporation of Internet 
Explorer into Windows 95, including customizing of "Start" 
menus and "thumbnail" previews, see id. at 27-28, are provid-
ed only by Internet Explorer 4.0 and not by Internet Explor-
er 3.0. See, e.g., J.A. 490-95, 1664-69. The majority seems 
to conclude that IE 3.0 and Windows 95 are "integrated" on 
the basis of little or no evidence. Should more evidence on 
this point come to light, the district court thus cannot be 
bound by the majority's conclusions. As to IE 4.0, the 
district court's preliminary conclusions seemed to hinge on 
the fact that Microsoft had offered the program only on a 
separate disk and not on the technology involved, see Micro-
soft, 980 F. Supp. at 544, thus suggesting that more factfind-
ing also needs to be done as to IE 4.0.

 Because I believe there is significant further factfinding as 
to intent and operation to be accomplished by the district 
court on remand, I would not rule out its authority to reissue 
a preliminary injunction.15 That is why I am troubled by the 

__________
 14 A word-processing program, for example, may contain a dictio-
nary feature as well as update certain operating-system code once 
installed. The fact that other applications may call on the dictio-
nary files, or that if the word-processing program were removed in 
its entirety, certain operating-system files would be "degraded," 
does not necessarily mean that the word-processing program is 
integrated with the operating system. It may be that only part of 
the program is so integrated, or it may be that none of it performs 
an operating-system function.

 15 In this respect, I note that this court has rejected the notion 
that the requirement that the government show a "substantial 
likelihood of success" means "to a certainty" or even "to 51 per-
cent." See Washington Metro. Area Transit Comm'n v. Holiday 
Tours, Inc., 559 F.2d 841, 844 (D.C. Cir. 1977). Rather, because the 
district court is to assess the propriety of a preliminary injunction 
in light of the relative strengths of all four factors (likelihood of 
success on the merits, irreparable injury, harm to other parties, and 

seemingly authoritative nature of the interpretation of section 
IV(E)(i) in the majority opinion, which would appear to 
foreclose any other interpretation of the section and proviso 
that might evolve in further proceedings and justify either a 
preliminary or a permanent injunction. To that extent, I 
respectfully dissent from the majority opinion.

__________
furtherance of the public interest), "the necessary 'level' or 'degree' 
of possibility of success will vary according to the court's assess-
ment of the other factors." Id. at 843.